REVISED April 9, 2012

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 21, 2012

Lyle W. Cayce

Clerk

No. 10-10751

VILLAS AT PARKSIDE PARTNERS, doing business as Villas at Parkside; LAKEVIEW AT PARKSIDE PARTNERS, LIMITED, doing business as Lakeview at Parkside; CHATEAU RITZ PARTNERS, doing business as Chateau De Ville; MARY MILLER SMITH;

                                            Plaintiffs–Appellees

v.

THE CITY OF FARMERS BRANCH, TEXAS,

                                            Defendant-Appellant

-------------------------------------------------------------------------------------------------

VALENTIN REYES; ALICIA GARCIA; GINGER EDWARDS; JOSE GUADALUPE ARIAS; AIDE GARZA

                                            Plaintiffs–Appellees

v.

CITY OF FARMERS BRANCH

                                            Defendant-Appellant

Appeals from the United States District Court
for the Northern District of Texas

Before REAVLEY, ELROD, and GRAVES, Circuit Judges.

REAVLEY, Circuit Judge:

The City of Farmers Branch, Texas, ("the City") appeals the district court's summary judgment enjoining it from implementing a purported housing ordinance that requires all adults living in rental housing within the City to obtain an occupancy license conditioned upon the occupant's citizenship or lawful immigration status. The district court concluded that the ordinance was preempted by federal law as a regulation of immigration that infringed Congress's constitutional power. The court also concluded that the ordinance was field preempted and conflict preempted under federal law. We conclude that the ordinance's sole purpose is not to regulate housing but to exclude undocumented aliens, specifically Latinos, from the City of Farmers Branch and that it is an impermissible regulation of immigration. We hold that the ordinance is unconstitutional and presents an obstacle to federal authority on immigration and the conduct of foreign affairs. We therefore AFFIRM the district court's judgment.

## I.  Background

The City adopted Ordinance 2952 ("the Ordinance") on January 22, 2008, requiring that every adult person wishing to rent or lease any single family residence or apartment within Farmers Branch must apply for a residential occupancy license from the City's Building Inspector.[1] Any proposed occupant who is not a United States citizen must provide an identification number establishing lawful presence in this country. If the non-citizen has no identification number, he may declare a lack of knowledge of such a number. The Building Inspector must verify with the federal government whether a non-citizen is "an alien lawfully present in the United States."

---

[1] The text of the Ordinance is set out in full in the appendix to this opinion.

The Building Inspector will revoke the occupancy license of an alien who is unlawfully present in this country. If the federal government is unable to verify the occupant's lawful status as requested, the Building Inspector may take the word of the alien, but the Ordinance makes it a criminal offense to make a false declaration on the occupancy license application. It is also a criminal offense for a person to occupy rental housing without a valid occupancy license or for a lessor to knowingly permit a person to occupy a rental unit without a valid license. The penalty for each offense is a fine of $500 per day of the occupancy.

The history of Ordinance 2952 began several years prior to its enactment when the City Council for Farmers Branch began considering a need to address perceived harms posed by illegal aliens, particularly Latinos, residing in the City. In 2006, the City Council passed a resolution expressing frustration over the federal government's purported failure to enforce immigration laws and to prevent the "influx of illegal aliens . . . estimated in the millions" that were "coming in across our most southerly border." The resolution declared the City's intent to "take whatever steps it legally can to respond to the legitimate concerns of our citizens." The City also adopted a resolution declaring English as the official language of Farmers Branch. The City subsequently passed Ordinance 2892, the first of three attempts to regulate immigration in the rental housing context. That ordinance directed owners and property managers to require submission of evidence of citizenship or immigration status for each tenant family. Around the time of that ordinance's adoption, the City also created a task force to assess redevelopment opportunities in the City, which issued several reports identifying the City's "lower income, minority population" and its increasing Hispanic and ethnic population as concerns and obstacles for

3

redevelopment.[2]  Ordinance 2892 was later repealed in 2007 after a state court enjoined it due to possible violations of the Texas Open Meetings Act.

The City Council subsequently adopted substantially similar provisions by passing Ordinance 2903, however, which additionally provided for a referendum on the measure.  Voters in the City approved Ordinance 2903, but in May 2008 a federal district court enjoined its enforcement, holding that the ordinance violated due process, was void for vagueness, and was an impermissible regulation of immigration under the Supremacy Clause.[3]

The City tried again to affect immigration through its housing regulations with the adoption of Ordinance 2952.  The preamble to the Ordinance expresses a specific intent "to enact regulations that are harmonious with federal immigration law and which aid in its enforcement."  Testimony of City officials during the proceedings in this case confirmed what was obvious from the text of the ordinance—that the City's intent with each of the regulations noted above was to enact an exclusionary rule for illegal aliens in Farmers Branch.  For example, Tim O'Hare, who was a member of the City Council until he was elected mayor in 2007, testified that the 2006 English language resolution was intended to increase assimilation of non-English speakers and to make the City

---

[2] For example, a December report from the task force listed "demographics" among the barriers to redevelopment, noting that "[t]he population of Farmers Branch is getting older and more diverse . . . ."  Explaining this remark, the task force stated that "[t]he City's Hispanic population increased from about 5 percent to 37 percent between 1970 and 2000 and continues to grow at a rate exceeding all other ethnic and racial populations in the City."  The task force believed that "factors that impact the sustainability of the development" of a major retail area in the City included the fact that retailers were "responding to demographic change by increasingly marketing to growing ethnic populations, which in turn is giving rise to shopping centers devoted exclusively to ethnic populations, especially Hispanic, African American, and Asian populations."

[3] See Villas at Parkside Partners v. Farmers Branch, 577 F. Supp. 2d 858, 866–77, 879 (N.D. Tex. 2008) (Farmers Branch I).

less attractive to undocumented immigrants.[4] He stated that the resolution and the ordinance that followed were meant to "help reduce the illegal immigrant population in Farmers Branch." Indeed, O'Hare testified that the purpose of all three ordinances—2892, 2903, and 2952—was to "mak[e] it difficult for illegal aliens to rent property in the City of Farmers Branch . . . ." He also testified about his frustration with the federal government's failure to enforce immigration laws, and he confirmed that Ordinance 2952 was intended to compensate for that perceived failure. O'Hare's testimony was consistent with that of City Attorney Tim Scott, who also testified that the goal of the Ordinance was to address illegal immigration issues and to "reduce the number of illegal immigrants in Farmers Branch."

As justification for the above intent, the Ordinance expresses that it is authorized pursuant to the City's "police power to protect the health, safety, and welfare of its citizens." It further states that the Ordinance does not entail an intent to "alter supplant, disrupt, or interfere with federal immigration law."

Two groups of plaintiffs representing lessors and lessees of rental property in Farmers Branch brought a pre-enforcement action against the City raising a facial challenge to the Ordinance. In ruling on cross-motions for summary judgment, the district court permanently enjoined enforcement of the Ordinance on three grounds.[5] The district court concluded that the Ordinance was a local "regulation of immigration" entrusted by the Constitution to Congress and was therefore preempted under the Supremacy Clause.[6] Although some local

---

[4] O'Hare testified that the resolution was "one of several things that sent a message to people who aren't in the country legally, Farmers Branch is not the place for you."

[5] See Villas at Parkside Partners v. City of Farmers Branch, 701 F. Supp. 2d 835 (N.D. Tex. 2010) ("Farmers Branch II"). The district court first determined that the plaintiffs had standing to challenge the Ordinance. Id. at 845–51. The City has not appealed the district court's ruling on standing.

[6] Id. at 855.

regulation which merely touches on aliens may be permissible,[7] the district court here reasoned that "the Ordinance, though grounded in federal immigration classifications, is an invalid regulation of immigration because it uses those classifications for purposes not authorized or contemplated by federal law."[8]

The district court further determined that the Ordinance was impliedly preempted by the Immigration and Nationality Act ("INA")[9] under theories of both field preemption and conflict preemption.[10]  The court reasoned that the INA is a "comprehensive regime for adjudicating an individual's right to remain in the country;" therefore, the Ordinance, "in addition to constituting a prohibited regulation of immigration [was field] preempted by the INA, which provides the exclusive means for removing aliens or adjudicating their status for that purpose."[11] With respect to conflict preemption, the district court noted that "[a] local regulation may not—though it may share a common goal with federal law—interfere with Congress's chosen methods."[12]  Therefore, even though the Ordinance did not "purport to remove aliens from the United States," it was conflict preempted because it "regulates local residence based on federal classifications in a manner that directly affects the uniform enforcement of immigration laws."[13]  The district court held that the City was impermissibly attempting to enforce its own immigration scheme.[14]  The City now appeals.

---

[7] See DeCanas v. Bica, 424 U.S. 351, 355, 96 S. Ct. 933, 936 (1976).

[8] Farmers Branch II, 701 F. Supp. 2d at 855.

[9] 8 U.S.C. § 1101 et seq.

[10] Farmers Branch II, 701 F. Supp. 2d at 857–58.

[11] Id.

[12] Id. at 857.

[13] Id. at 857–58.

[14] Id. at 859.

## II. Discussion

We review a grant of summary judgment on preemption grounds de novo, applying the same standards as the district court.[15] "Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[16]

The City contends on appeal that the district court erred by declining to afford the Ordinance a presumption against preemption, by finding that the Ordinance is a regulation of immigration, and by finding that the Ordinance is field and conflict preempted. It contends that the Ordinance is merely an exercise of its police power to enact a housing regulation and that the Ordinance only tangentially touches upon aliens and immigration. We conclude, however, that the Ordinance is designed to burden aliens, both documented and undocumented, in Farmers Branch. As such, the Ordinance serves no legitimate City interest and is not a mere housing regulation entitled to a presumption against preemption; instead, it burdens the field of immigration.

## A. Effect of Ordinance 2952 and the presumption against preemption

In the field of immigration, the power to regulate "is unquestionably exclusively a federal power."[17] The exclusivity of Congress's power stems from multiple constitutional sources, "including the Federal Government's power '[t]o establish [a] uniform Rule of Naturalization,' . . . its power '[t]o regulate Commerce with foreign Nations,' . . . and its broad authority over foreign affairs."[18] It is clear from these sources of the federal power that immigration is inextricably tied to national interests in many areas, one of the most

---

[15] O'Hara v. Gen. Motors Corp., 508 F.3d 753, 757 (5th Cir. 2007).

[16] Griffin v. United Parcel Serv., Inc., 661 F.3d 216, 221 (5th Cir. 2011) (citation omitted); see FED. R. CIV. P. 56(a).

[17] DeCanas, 424 U.S. at 354, 96 S. Ct. at 936.

[18] Toll v. Moreno, 458 U.S. 1, 10 (1982) (alterations in original) (citations omitted).

7

significant of which is foreign relations. Indeed, the Supreme Court has recognized that immigration and the governing national policy thereof are inherently part of foreign affairs: "[T]he supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution."[19] Given the breadth of the Constitution's understanding of immigration as a domain of the federal government, state and local laws that attempt to affect aliens will, with limited exceptions, be preempted by the national interest. We therefore begin by considering the preemption doctrine.[20]

"By virtue of the Supremacy Clause, it is a 'fundamental principle of the Constitution . . . that Congress has the power to preempt state law.'"[21] Federal law will preempt a state or local regulation "when (1) Congress expressly preempts state law; (2) Congressional intent to preempt may be inferred from the existence of a pervasive federal regulatory scheme; or (3) state law conflicts with federal law or its purposes."[22] A pervasive federal regulatory scheme may show that Congress intended to preempt the field, leaving no room for the states

---

[19] Hines v. Davidowitz, 312 U.S. 52, 62, 61 S. Ct. 399, 402–03 (1941) (emphasis added).

[20] As an initial matter, the City argues that the district court misapplied the standard for evaluating facial challenges to statutes because the court here did not consider whether there were any circumstances under which application of the Ordinance would be constitutional. See United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987) (stating that a facial challenge "must establish that no set of circumstances exists under which the [challenged] Act would be valid"). The City's reliance on Salerno in support of its argument is unconvincing. If the Ordinance here goes beyond the City's constitutional authority to act, or if it conflicts with Congressional intent, it is irrelevant whether some of its provisions might be constitutionally applied. We therefore proceed to consider whether the Ordinance is a permissible exercise of the City's regulatory authority.

[21] Planned Parenthood of Houston & Se. Tex. v. Sanchez, 403 F.3d 324, 336 (5th Cir. 2005) (quoting Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372, 120 S. Ct. 2288, 2293 (2000)).

[22] Frank v. Delta Airlines Inc., 314 F.3d 195, 197 (5th Cir. 2002) (citing English v. Gen. Elec. Co., 496 U.S. 72, 78–79, 110 S. Ct. 2270, 2275 (1990)).

to supplement it.[23]  Even if Congress has not occupied the field, however, a state law will be preempted "where it is impossible for a private party to comply with both state and federal law," or where the state law presents an "obstacle" to the accomplishment of the purposes of the federal law.[24]

A state law will be presumed to be valid "[i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied."[25]  This presumption serves purposes of federalism because where Congress acts in a field traditionally occupied by the states, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[26]  Nevertheless, this presumption against federal preemption "is not triggered when the State regulates in an area where there has been a history of significant federal presence."[27]  A threshold question then is whether the Ordinance here stands in an area of traditional state regulation, entitled to a presumption of validity, or instead receives no benefit from the presumption because it attempts to legislate in an area of significant federal concern.

As noted above, Congress has plenary power to regulate immigration.[28]  Thus, Congress and the federal government historically have had a presence in the immigration field.  However, the fact that aliens are the subject of a local

---

[23] English, 496 U.S. at 79, 110 S. Ct. at 2275.

[24] Crosby, 530 U.S. at 372–73, 120 S. Ct. at 2294.

[25] Wyeth v. Levine, 555 U.S. 555, 565, 129 S. Ct. 1187, 1194 (2009) (internal quotation marks and citation omitted).

[26] Rice v. Sante Fe Elevator Corp., 331 U.S. 218, 230, 67 S. Ct. 1146, 1152 (1947).

[27] United States v. Locke, 529 U.S. 89, 90, 120 S. Ct. 1135, 1139 (2000).

[28] DeCanas, 424 U.S. at 354, 96 S. Ct. at 936.

regulation, standing alone, does not mean that the statute is a regulation of immigration that is preempted by federal law.[29]

For example, in DeCanas, the State of California prohibited the employment of unlawful aliens in the state, and the Court held that this was a permissible attempt to "strengthen [California's] economy by adopting federal standards in imposing criminal sanctions against state employers who knowingly employ aliens who have no federal right to employment within the country."[30] Thus, the Court viewed the state statute as an employment regulation, an area in which states have traditionally regulated, not a regulation of immigration. The Court further reasoned that the state statute was not field or conflict preempted because states retain "broad authority under their police powers to regulate the employment relationship to protect workers within the State," and there was no indication that Congress intended to preclude states from regulating the employment of aliens.[31] Instead, at the time of the state regulation Congress had expressed "at best" only a "peripheral concern with [the] employment of illegal entrants."[32] Rather than conflict with a Congressional act, the state law was consistent with a Congressional intent to allow states to regulate the employment of illegal aliens.[33]

---

[29] Id. at 355, 96 S. Ct. at 936; see also Plyler v. Doe, 457 U.S. 202, 225, 102 S. Ct. 2382, 2399 (1982) ("[T]he States do have some authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal.").

[30] DeCanas, 424 U.S. at 355, 96 S. Ct. at 936.

[31] Id. at 356 & 358, 96 S. Ct. at 937–38.

[32] Id. at 361, 96 S. Ct. at 939.

[33] Id.; Congress later overruled this part of DeCanas's holding when it passed the Immigration Reform and Control Act of 1986, Pub. L. 99-603, 100 Stat. 3359, which expressly preempted "state laws imposing civil fines for the employment of unauthorized workers like the one [DeCanas] upheld." Chamber of Commerce v. Whiting, 131 S. Ct. 1968, 1975 (2011).

In the instant case, the City asserts that a presumption against preemption of the Ordinance applies because the Ordinance is a regulation of residential housing and the issuance of licenses to occupy rental units, which it argues is an area historically occupied by the states. According to the City, the Ordinance merely applies federal classifications consistent with federal law to achieve a purely local result. We disagree.

The text of the Ordinance, and the circumstances surrounding its adoption, show that its purpose and effect are to regulate immigration, an area of federal concern, rather than to regulate housing. The preamble to the Ordinance specifically states that the Ordinance is intended to aid the enforcement of "federal immigration law," not housing law. (Emphasis added). In fact, the Ordinance refers to federal immigration law either directly or by implication in seven of its eleven introductory "whereas" clauses. Moreover, the Ordinance ranges beyond landlord-tenant law because it conditions the validity of an occupancy license on the lawfulness of an occupant's immigration status, thereby expressly tying the Ordinance's criminal offenses to immigration rather than to some violation of the housing code. These facts belie the City's argument that the Ordinance is nothing more than a housing regulation.

On the contrary, the Ordinance has virtually nothing to say about the housing rental market, except for boilerplate language referencing the City's police power to protect its citizens. The regulatory scheme created by the Ordinance has none of the indicia one would expect of a housing regulation. For example, the Ordinance says nothing about the location, design, construction, maintenance, ownership, or alteration of residential rental units. It also provides no regulation for the number of residents or the permitted uses of rental housing. The Ordinance creates an application process for an occupancy license, but the applicant is not required to submit information about his employment or credit history, his past residence information, or his criminal

11

history. All that is required, besides standard information such as one's name and address, is one's citizenship information. Moreover, the only reason an occupancy license may be revoked is based on immigration status. On its face then the Ordinance hardly evinces a purpose to regulate rental housing in the City and instead points toward the real target of the regulation—the ferreting out and exclusion of undesirable illegal immigrants.

This purpose of the statute is confirmed by the evidence in the record. Despite an assertion in the preamble that the Ordinance was intended to promote the public health, safety, and general welfare, the City points to nothing showing an effect on public welfare by illegal aliens' occupancy of rental housing. The mayor of Farmers Branch confirmed that the City conducted no studies on the effects of undocumented aliens on the value of property in Farmers Branch, the quality of its schools, the crime rate, or the availability of healthcare to its residents. One City Council member, Gary Greer, testified that there was no data showing whether undocumented immigrants commit more crimes than others in Farmers Branch. Still another council member, David Koch, agreed that the Ordinance was "not directed in any way towards revitalization" but rather was "directed solely towards removing illegal immigrants."

The removal of illegal immigrants is thus the precise and intended effect of the Ordinance. Although the Ordinance provides no express removal mechanism, removal is the practical result of the Ordinance because it regulates who may be an occupant based solely on immigration status. This functional denial to aliens of access to rental housing based on their immigration status is "tantamount to the assertion of the right to deny them entrance and abode," an area that is historically one of federal, not state, concern.[34]

---

[34] Truax v. Raich, 239 U.S. 33, 42, 10 S. Ct. 7, 11 (1915).

12

The Third Circuit reached the same conclusion in a case addressing a similar municipal ordinance that required prospective occupants of rental housing to obtain an occupancy license and provide proof of legal citizenship or residency.[35] As the Third Circuit noted, we cannot ignore "the reality" that the Ordinance seeks to affect directly the presence of aliens in Farmers Branch and to condition that presence upon the lawfulness or unlawfulness of their immigration status.[36] The reality is that all aliens who are deemed unlawfully present because of an absence of documentation are effectively excluded from Farmers Branch. But because the prerogative of deciding which aliens may live in the United States belongs to the federal government, the City's Ordinance does not regulate in an area historically occupied by the states, and the district court correctly declined to afford it a presumption of validity.

## B. Regulation of immigration and preemption

The conclusion that the Ordinance is not a local housing regulation, and instead determines which aliens may reside in Farmers Branch, necessarily compels our conclusion about preemption of the Ordinance as a regulation of immigration contrary to federal authority. Because we conclude that the sole purpose of the Ordinance is to target illegal aliens and effect their removal from the City, we also conclude that the Ordinance is an impermissible regulation of immigration posing an obstacle to federal control of immigration policy.

---

[35] Lozano v. City of Hazelton, 620 F.3d 170, 220 (3d Cir. 2010), vacated by 131 S. Ct. 2958 (2011). The Third Circuit's decision in Lozano addressed local regulations concerning aliens and immigration in both the housing and employment contexts. The Supreme Court recently vacated the Third Circuit's judgment for further consideration in light of Chamber of Commerce v. Whiting, 131 S. Ct. 1968 (2011). See City of Hazelton v. Lozano, 131 S. Ct. 2958 (2011). In Whiting, the Court upheld a local regulation concerning the employment of illegal aliens, but it was not faced with regulations affecting immigration in the housing context. Therefore, although we acknowledge that the entirety of the Third Circuit's judgment has been vacated, we nevertheless find Lozano's reasoning instructive in this case because the Third Circuit was faced with a housing regulation squarely analogous to the one in the instant case, and the Supreme Court's decision in Whiting does not affect that reasoning.

[36] Lozano, 620 F.3d at 220.

As noted above, the national government is entrusted with significant constitutional power to regulate immigration flowing from, inter alia, its power over foreign affairs. In light of this close relationship between immigration and foreign relations, then, it is necessary that the federal government, rather than individual states, have "broad" power over the presence of aliens, including the power to "determin[e] what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization." Takahashi v. Fish & Game Comm'n.[37] Indeed, Congress has exercised its exclusive power by enacting the Immigration and Nationality Act ("INA"),[38] which "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'"[39]

State or local legislation that interferes with or burdens the broad federal power is impermissible, even if local and federal laws share a common goal.[40] For example, in Hines the Supreme Court addressed the validity of a state alien-registration law in light of a subsequently enacted federal law that required similar registration.[41] The subject matter of the state and federal laws was

---

[37] 334 U.S. 410, 419, 68 S. Ct. 1138, 1142 (1948) (citation omitted); see also Mathews v. Diaz, 426 U.S. 67, 84, 96 S. Ct. 1883, 1893–94 (1976) ("[I]t is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens.").

[38] See 8 U.S.C. § 1101 et seq.

[39] Whiting, 131 S. Ct. at 1973 (quoting DeCanas, 424 U.S. at 353 & 359, 96 S. Ct. at 935 & 938).

[40] See Takahashi, 334 U.S. at 419, 68 S. Ct. at 1142 ("State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration, and have accordingly been held invalid.") (footnote omitted).

[41] Hines, 312 U.S. at 56, 61 S. Ct. at 400.

essentially identical, but the Court concluded that the state did not possess equal and concurrent power over alien registration.[42] Of particular "importance" was the fact that the state law was "in a field which affects international relations, the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority."[43] Because of this imperative for a uniform national expression of policy, the Court concluded that the state could not enact its own laws that inter alia "complement[] the federal law, or enforce additional or auxiliary regulations."[44] The Court so concluded, even though compliance with both the federal and state laws was possible, because the state act was "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[45]

In the instant case, we think that the Ordinance similarly infringes Congress's exclusive authority over the regulation of immigration and treads on foreign relations in a way contrary to the requirement of a national voice on immigration policy. The City argues that the Ordinance does not regulate immigration because it does not make a determination about admittance into the United States or the conditions under which a lawful entrant may remain in this

---

[42] Id. at 68, 61 S. Ct. at 405. Although the Court did not address whether the state law was impermissible because federal power, whether exercised or unexercised, is exclusive, see id. at 401, 61 S. Ct. at 62, we find the Court's discussion of state-federal interaction to be particularly instructive to the instant case. As noted above, the exclusivity of Congress's power to regulate immigration is well established. See DeCanas, 424 U.S. at 354, 96 S. Ct. at 936; Truax, 239 U.S. at 42, 36 S. Ct. at 11 ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government.") (citation omitted).

[43] Hines, 312 U.S. at 68, 61 S. Ct. at 404; see also Crosby, 530 U.S. at 381, 120 S. Ct. at 2298 (holding preempted a state law restricting authority of state agencies to purchase goods and services from companies doing business with Burma, even though it shared the same goal as a similar federal law, because inter alia the state law "compromise[d] the very capacity of the President to speak for the Nation with one voice in dealing with other governments").

[44] Hines, 312 U.S. at 66–67, 61 S. Ct. at 404.

[45] Id. at 67, 61 S. Ct. at 404.

country. The City contends that the Ordinance instead merely defers to federal categories of immigration status and to federal determinations of any particular alien's status. We are unconvinced.

The Supreme Court stated in DeCanas that a "regulation of immigration . . . is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain."[46] We recognize that the Ordinance here does not literally control the entry and exit of aliens into and out of Farmers Branch or the United States. However, we do not read the quoted language from DeCanas in the same literal and hyper-technical manner as does the City because we do not read DeCanas as attempting to define an impermissible regulation of immigration. In context, the quoted language merely recognized as impermissible a category of state and local regulation that would be unconstitutional even with explicit Congressional authorization. But as the Court later explained, DeCanas "rejected the pre-emption claim not because of an absence of congressional intent to pre-empt, but because Congress intended that the States be allowed, 'to the extent consistent with federal law, [to] regulate the employment of illegal aliens.'"[47] The Court found specific Congressional authorization for the local law in DeCanas, in an area—employment—that also had historic state regulation, and so there was no need to define the outer bounds of what it means to be a regulation of immigration. In this case, however, we believe that the Ordinance does in fact regulate immigration because it seeks to address directly the presence of aliens within the City's borders. We agree with the Third Circuit's

---

[46] DeCanas, 424 U.S. at 355, 96 S. Ct. at 936 (emphasis added).

[47] Toll, 458 U.S. at 13 n.18, 102 S. Ct. at 2984 n.18 (emphasis in original) (quoting DeCanas, 424 U.S. at 361, 96 S. Ct. at 939). In DeCanas, the Court found evidence that Congress intended to permit states to regulate the employment of illegal aliens by looking to amendments made in 1974 to the Farm Labor Contractor Registration Act. See DeCanas, 424 U.S. at 361, 96 S. Ct. at 939 (citing 88 Stat. 1652, 7 U.S.C. § 2041 et seq.).

view that "[i]t is difficult to conceive of a more effective method of ensuring that persons do not enter or remain in a locality than by precluding their ability to live in it."[48]

By denying aliens access to rental housing, the Ordinance here effectively forces them to relocate. As noted above, the preamble to the Ordinance expressly states that it is designed to enforce immigration law, and numerous City officials explicitly stated that the ordinance was intended to reduce the number of illegal aliens in Farmers Branch. The undeniable practical effect of the Ordinance is thus to compel the departure of aliens from the City to other cities, states, or foreign countries, thereby setting the City's own policy on immigration and regulating immigration across and outside the City's borders.[49]

Moreover, as the district court held, the Ordinance imposes additional burdens on aliens that were not contemplated by Congress.[50] For example, the Ordinance requires illegal aliens to declare themselves to the City Building Inspector, denies them the ability to enter private contracts for shelter, and subjects them to criminal sanctions, all in an effort to exclude them from the City. Because states lack the constitutional power of the federal government when it comes to immigration, however, the Ordinance may "neither add to nor

---

[48] Lozano, 620 F.3d at 220–21 (internal quotation marks and citation omitted). We also think that access to housing, or the lack thereof, is also a more direct regulation of an alien's presence in a location than the denial of employment, which further distinguishes this case from DeCanas. Cf. Truax, 239 U.S. at 42, 10 S. Ct. at 11.

[49] See United States v. Arizona, 641 F.3d 339, 367 (9th Cir. 2011) (Noonan, J., concurring) (finding that where state legislature declared that the presence of illegal aliens was to be discouraged and their number diminished by Arizona statute requiring law enforcement officers to check a person's immigration status, "[w]ithout qualification, Arizona establishes its policy on immigration"), cert. granted by 132 S. Ct. 845 (2011) (No. 10A1277, 11-182); cf. Healy v. Beer Inst., Inc., 491 U.S. 324, 332, 109 S. Ct. 2491, 2497 (1989) ("[A] state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause.").

[50] See Farmers Branch II, 701 F. Supp. 2d at 855.

take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states."[51]

Because the Ordinance has no other purpose than to exclude undocumented aliens who are in the city seeking residence, it adds to the serious national federal problem with immigration and the relations of this country with other countries, especially Mexico. Growing evidence of this national problem can be seen in federal court litigation, as numerous state and local governments seek to target problems, real or imagined, with illegal immigrants. As already noted, a Pennsylvania municipality passed an ordinance virtually identical to Farmers Branch's ordinance seeking to condition residence in rental housing on an occupant's lawful immigrations status.[52] Arizona, reacting to "a serious problem of unauthorized immigration along the Arizona-Mexico border," enacted legislation creating its own immigration policies and seeking to deter unlawful entry by requiring its police officers to enforce those policies.[53] And the state legislature in Alabama has also sought to discourage illegal immigration by enacting a law creating numerous criminal offenses predicated on

---

[51] Takahashi, 334 U.S. at 419, 68 S. Ct. at 1142; see also Lozano, 620 F.3d at 220 ("The comprehensiveness of the INA scheme for regulation of immigration and naturalization . . . plainly precludes state efforts, whether harmonious or conflicting, to regulate residence in this country based on immigration status.") (internal quotation marks and citation omitted).

[52] See Lozano, 620 F.3d at 180.

[53] See Arizona, 641 F.3d at 343. The Arizona law requires police to investigate a person's immigration status when stopped or arrested if the person is suspected of being in the state without authorization, see id. at 346; creates offenses for an alien to fail to carry registration documents, id. at 354–55, or to work in the state without authorization, id. at 357; and allows police to arrest a person without a warrant if police have probable cause to believe the person is removable from the United States, id. at 360. As noted above, the Supreme Court recently granted certiorari in the Arizona case and will decide whether Arizona's statute is preempted by federal immigration law. See Arizona v. United States, 132 S. Ct. 845 (2011) (No. 10A1277, 11-182).

immigration status.[54] This increasing treatment—some might say mis-treatment—of illegal immigrants around the country only reinforces what the Supreme Court has said in explaining why a national policy on immigration unimpeded by the whims of the various states is paramount.

As the Court has put it, "[i]f th[e] government [of California] should get into a difficulty [because of its treatment of noncitizens] which would lead to war, or to suspension of intercourse, would California alone suffer, or all the Union?"[55] Clearly then, the treatment of aliens entails issues of national concern that reach beyond parochial concerns of individual states and includes matters such as trade, treaty obligations, and reciprocal rights agreements. It is imperative that the nation act singularly in conducting matters of foreign relations, particularly the treatment of noncitizens, because the burdening of another country's citizens will undoubtedly affect how this nation's citizens are in turn treated abroad. The Supreme Court has said that

> [o]ne of the most important and delicate of all international relationships, recognized immemorially as a responsibility of government, has to do with the protection of the just rights of a country's own nationals when those nationals are in another country. Experience has shown that international controversies of the gravest moment, sometimes even leading to war, may arise from

---

[54] See United States v. Alabama, 813 F. Supp. 2d 1282 (N.D. Ala. 2011). The Alabama law, inter alia, makes it a misdemeanor to willfully fail to carry an alien registration document; makes it unlawful for an unauthorized alien to apply for, solicit, or perform work; requires law enforcement officers to determine citizenship for persons stopped, detained, or arrested when the person is suspected to be unlawfully present in the United States; makes it unlawful to conceal, harbor, or shield an unlawful alien or to encourage an unlawful alien to come to the United States; forbids employers from claiming as business tax deductions wages paid to unauthorized aliens; and makes it a felony for an unlawful alien to enter into a business transaction with the state or any of the state's political subdivisions. Id. at 1292–93.

[55] Chy Lung v. Freeman, 92 U.S. 275, 279 (1875).

real or imagined wrongs to another's subjects inflicted, or permitted, by a government.[56]

It is clear to us that the City of Farmers Branch, by enacting the Ordinance, threatens the careful balance that the federal government must maintain in foreign affairs and impedes the federal prerogative for deciding how to treat illegal immigrants, which it achieves through the scheme of the INA. Although the City argues that the Ordinance is consistent with the INA and that Congress explicitly contemplated state regulations addressing the presence of illegal aliens, we are unpersuaded. The INA provisions cited by the City may contemplate cooperation among the federal, state, and local governments in the enforcement of the federal immigration scheme and the arrest of illegal immigrants,[57] but we do not read the INA to contemplate a locality enacting its

---

[56] Hines, 312 U.S. at 65, 61 S. Ct. at 403 (footnote omitted); see also Chy Lung, 92 U.S. at 279 ("[W]e venture the assertion, that, if citizens of our own government were treated by any foreign nation as subjects of the Emperor of China have been actually treated under this law, no administration could withstand the call for a demand on such government for redress."). How non-citizens within our borders are treated and the consequences for our international obligations and the treatment of our own citizens abroad are just as much a national concern today as in the days of Hines and Chy Lung. Only this year, Secretary of State Hillary Clinton reaffirmed this point in a written statement to Congress, where she stated that "[t]he State Department has no greater responsibility than the protection of U.S. citizens overseas" and that "[t]o protect our citizens, we need to do our part to protect those of other countries." Fulfilling Our Treaty Obligations and Protecting Americans Abroad: Hearing on S. 1194 Before the Senate Committee on the Judiciary, 112th Cong. 12-13 (2011) (appendix to testimony of Patrick F. Kennedy, Under Secretary of State); digested at 157 CONG. REC. D 8 5 3 , a v a i l a b l e a t http://www.judiciary.senate.gov/hearings/testimony.cfm?id=3d9031b47812de2592c3baeba6 2c686d&witid=3d9031b47812de2592c3baeba62c686d-1-1.

[57] See, e.g., 8 U.S.C. § 1324(c) (contemplating that "officers whose duty it is to enforce criminal laws," including state officers, may arrest persons who violate the INA's anti-harboring provisions); § 1357(g)(10) (contemplating cooperation between state officers and the federal government "in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States"); § 1373(c) (requiring Immigration and Naturalization Service to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law"); § 1621 (making unlawful aliens ineligible for certain defined state benefits and public assistance); § 1644 (requiring that state

own scheme of immigration enforcement or its own ordinances to deal with illegal aliens in whatever manner the locality deems fit.[58]

The INA provides a comprehensive scheme, with ample provision for the exercise of discretion, for the federal government to determine how best to address or to not address illegal aliens. Whereas the Ordinance precludes an alien's presence in rental housing—and by extension within the City—based solely on the unlawfulness of the alien's immigration status, a similar unlawfulness determination in the federal scheme would merely subject an alien to the process of the INA, under which removal of an alien may not result until after a hearing and an opportunity for the alien to be heard.[59] The federal government has determined that such process is the exclusive means for adjudicating whether a particular alien will be removed.[60] It is no response to say, as the City does, that the Ordinance defers to the federal classification of an alien's immigration status because, although the Ordinance uses some of the

---

and local governments must be permitted to "send[] to or receiv[e] from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States").

[58] It is true that in Plyler, which addressed an equal protection challenge to a state's denial of public education to the children of undocumented aliens, the Supreme Court said that states are not "without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns." Plyler, 457 U.S. at 228 n.23, 102 S. Ct. at 2400 n.23. The Court supported its statement by citing DeCanas, which we have already noted involved the regulation of employment, an area of frequent state concern and regulation. See DeCanas, 424 U.S. at 356–57, 96 S. Ct. at 937 (noting states' "broad" authority over employment relationships and the local problems addressed by the state regulation). The Plyler Court thus recognized state authority to regulate aliens in areas of traditional state interest; it did not find permissible state regulations that directly affect the entry or removal of illegal aliens, which is what the Ordinance in this case does.

[59] See 8 U.S.C. §§ 1229 and 1229a (outlining procedures for removal proceedings).

[60] See § 1229a(a)(3) (providing that "a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States").

21

same terms as federal immigration law, it seeks to use an alien's immigration status for a purpose different from that intended under the federal scheme.[61]

An alien's unlawful status and eligibility for removal does not ipso facto mean that the alien will be removed, as it would under the Ordinance. Instead, the federal government has broad discretion to cancel removal or adjust an alien's status under a variety of circumstances.[62] "In light of the discretionary federal power to grant relief from [removal], a State cannot realistically determine that any particular undocumented [alien] will in fact be [removed] until after [removal] proceedings have been completed."[63] Yet, the Ordinance here dispenses with the procedures and discretion of the federal scheme to preclude an alien from residence in the City solely due to a status classification as unlawful even though the same alien might be entitled to relief under the federal process. That is not permissible under the Constitution and the Supremacy Clause.

## III. Conclusion

This country has a large Latino population and millions of Latinos live here without legal permission. However, the great majority live quietly, raise families, obey the law daily, and do work for our country. For all that they

---

[61] See, Plyler, 457 U.S. at 225, 102 S. Ct. at 2399 (state regulation of aliens must "mirror federal objectives") (emphasis added).

[62] See, e.g., 8 U.S.C. § 1229b(a) (providing Attorney General with discretion to cancel removal of an alien who is otherwise inadmissible or subject to deportation if alien meets specified requirements); § 1229b(b)(2) (providing Attorney General with discretion to cancel removal and adjust status of an alien who is a victim of domestic violence).

[63] Plyler, 457 U.S. at 226, 102 S. Ct. at 2399. We might add that we do not read any provision of the INA as contemplating that illegal aliens would be homeless during the process. See Cent. Ala. Fair Housing Ctr. v. Magee, 2011 WL 6010501, at *7 (M.D. Ala. Dec. 1, 2011) ("Congress never criminalized an alien's attempt to lawfully reside in his home; nor has Congress permitted States to regulate the residence of aliens. Instead, enforcement is left to the executive."); see also 8 U.S.C. § 1229(a)(1)(F) (requiring aliens in removal proceedings to provide an address where the alien may be contacted).

contribute to our welfare, they live in constant dread of being apprehended as illegal aliens and being evicted, perhaps having their families disrupted. As unsatisfactory as this situation is it is the immigration scheme we have today. Any verbal and legal discrimination against these people, as Farmers Branch exemplifies by this ordinance, exacerbate the difficulty of that immigration scheme. This is a national problem, needing a national solution. And it impacts the nation's relations with Mexico and other nations. The Supreme Court long ago pointed out in Chy Lung the problem for this country of treating Chinese people poorly.[64] And as the Court said in Harisiades v. Shaughnessy, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government."[65]

Because the sole purpose and effect of this ordinance is to target the presence of illegal aliens within the City of Farmers Branch and to cause their removal, it contravenes the federal government's exclusive authority over the regulation of immigration and the conditions of residence in this country, and it constitutes an obstacle to federal authority over immigration and the conduct of foreign affairs. The ordinance is unconstitutional, and the judgment of the district court is affirmed.

AFFIRMED.

---

[64] 92 U.S. at 279.

[65] 342 U.S. 580, 588–89, 72 S. Ct. 512, 519 (1952).

Appendix

CITY OF FARMERS BRANCH
ORDINANCE NO. 2952

AN ORDINANCE PROVIDING FOR RESIDENTIAL OCCUPANCY LICENSES; PROVIDING FOR VERIFICATION OF ALIENS' IMMIGRATION STATUS WITH THE FEDERAL GOVERNMENT CONSISTENT WITH FEDERAL LAW; CREATING OFFENSES; PROVIDING FOR ENFORCEMENT; PROVIDING FOR JUDICIAL REVIEW; PROVIDING A PENALTY; PROVIDING A SEVERABILITY CLAUSE; AND PROVIDING AN EFFECTIVE DATE.

WHEREAS, federal law prescribes certain conditions (found principally in Title 8, United States Code, Sections 1101, et seq.), that must be met before an alien may be lawfully present in the United States; and

WHEREAS, aliens not lawfully present in the United States, as determined by federal law, do not meet such conditions as a matter of law when present in the City of Farmers Branch; and

WHEREAS, pursuant to Title 8, United States Code Sections 1621, et seq., certain aliens not lawfully present in the United States are not eligible for certain State or local public benefits, including licenses; and

WHEREAS, Title 8, United States Code, Section 1324(a)(1)(A), prohibits the harboring of aliens not lawfully present in the United States, including, as the courts of the United States have held, the provision of residential accommodations to such aliens; and

WHEREAS, the City of Farmers Branch is authorized to adopt ordinances pursuant to its police power to protect the heath, safety, and welfare of its citizens; and

WHEREAS, the City of Farmers Branch is authorized to adopt regulations touching on aliens that are consistent with pertinent federal laws; and

WHEREAS, it is the intent of the City of Farmers Branch to enact regulations that are harmonious with federal immigration law and which aid in its enforcement; and

WHEREAS, it is not the intent of the City of Farmers Branch to alter, supplant,

disrupt, or interfere with federal immigration law; and

WHEREAS, the provisions of this ordinance shall be applied uniformly and in a nondiscriminatory manner, and the application of these provisions must not differ based on a person's race, religion, or national origin; and

WHEREAS, the City of Farmers Branch has complied with all prerequisites for the passage of this Ordinance; and

WHEREAS, the meeting at which this Ordinance was adopted was properly posted in accordance with the Open Meetings Act, and this Ordinance was considered and approved in an open meeting of the City Council with opportunity for public comment regarding its terms and provisions; and

WHEREAS, the purposes of this Ordinance are to promote the public health, safety, and general welfare,

NOW, THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF FARMERS BRANCH, TEXAS:

Section 1:    Chapter 26, Businesses, Article III, Single-Family Rental Housing, of the Code of Ordinances, City of Farmers Branch, Texas, is hereby amended by adding the following as Section 26-79:

"Section 26-79. Citizenship or Immigration Status Verification

(A) Definitions

The following terms and phrases, when used in this section, shall have the meanings ascribed to them in this section, and shall be construed so as to be consistent with state and federal law, including federal immigration law:

(1) "Alien" means any person not a citizen or national of the United States, as set forth in Title 8, United States Code, Section 1101(3), as amended.

(2) "Lessor" means a person who leases or rents a single family residence as or on behalf of a landlord.

(3) "Occupant" means a person, age 18 or older, who resides at a single family residence. A temporary guest of an occupant is not an occupant for the purposes of this section.

(B) Residential Occupancy Licenses

(1) Prior to occupying any leased or rented single-family residence, each occupant must obtain a residential occupancy license.

(2) It is the occupant's responsibility to submit an occupancy license application to the building inspector, pay a fee of $5 to the City, and obtain a residential occupancy license. If there are multiple occupants seeking to occupy a single rental unit, each occupant must obtain his or her own residential occupancy license. Multiple applicants for occupancy of the same single family residence may designate one of their number as their agent to submit the required application forms, provided that each individual applicant signs his or her own application form. The building inspector may establish a procedure whereby an applicant (or designated agent) may submit the application forms), signed by the applicant(s), via facsimile or website portal.

(3) The lessor shall notify each prospective tenant of the requirements of paragraph (B)(2) of this section.

(4) A residential occupancy license is valid only for as long as the occupant continues to occupy the single family residence for which the license was issued. Any relocation to a different leased or rented dwelling unit requires a new residential occupancy license.

(5) An application for a residential occupancy license shall be made on a form furnished by the building inspector for such purpose. The form shall require the following information:

(a) full legal name of the occupant;

(b) mailing address of the occupant;

(c) address of the single family residence for which the occupant is applying, if different from the mailing address;

(d) name and business address of the lessor;

(e) date of lease or rental commencement;

(f) date of birth of the occupant;

(g) the occupant's country of citizenship;

(h) if the applicant is a United States citizen or national, a signed declaration that the applicant is a United States citizen or national; the form shall state that it is a crime under Title 18, United States Code, Section 1015(e), for a person to knowingly make any false statement or claim that he or she is, or at any time has been, a citizen or national of the United States, with the intent to obtain on behalf of himself or herself, or any other person, any Federal or State benefit or service;

-or-

(i) if the applicant is not a United States citizen or national, an identification number assigned by the federal government that the occupant believes establishes his or her lawful presence in the United States (examples include, but are not limited to: resident alien card number, visa number, "A" number, 1-94 registration number, employment authorization number, or any other number on a document issued by the U.S. Government). If the applicant does not know of any such number, he or she shall so declare. Such a declaration shall be sufficient to satisfy this requirement.

(6) Upon receipt of the completed application and the payment of the application fee as set forth above, the building inspector shall immediately issue a residential occupancy license. The building inspector shall not deny a residential occupancy license to any occupant who submits a completed application and pays the application fee.

(7) The information provided on an application may be disclosed to the federal government according to paragraph (D) of this section, pursuant to Title 8, United States Code, Section 1373.

(C) Offenses

(1) It shall be an offense for a person to be an occupant of a leased or rented single family residence without first obtaining a valid occupancy license permitting the person to occupy that single family residence.

(2) It shall be an offense for a person to knowingly make a false statement of fact on an application for a residential occupancy license.

(3) It shall be an offense for a person to create, possess, sell, or distribute a counterfeit residential occupancy license.

(4) It shall be an offense for a lessor to lease or rent a single family residence without obtaining and retaining a copy of the residential occupancy license of any and all known occupants.

(5) It shall be an offense for a landlord to fail to maintain at the landlord's residence or regular place of business a copy of the residential occupancy license of each known occupant of a leased or rented single-family residence, or to fail to make such copy available for inspection by the Building Inspector during regular business hours.

(6) It shall be an offense for a lessor to lease a single family residence without including in the terms of the lease a provision stating that occupancy of the premises by a person, age 18 or older, who does not hold a valid residential occupancy license constitutes an event of default under the lease.

(7) It shall be an offense for a landlord or any agent of a landlord with authority to initiate proceedings to terminate a lease or tenancy to knowingly permit an occupant to occupy a single family residence without a valid residential occupancy license. It is a defense to a prosecution under this paragraph that the landlord or agent has commenced and diligently pursued such steps as may be required under the applicable law and lease provisions to terminate the lease or tenancy.

(D) <u>Enforcement</u>

The building inspector shall enforce the requirements of this section as follows.

(1) Promptly after issuance of a residential occupancy license to any occupant who has not declared himself or herself to be either a citizen or a national of the United States in accordance with paragraph (B)(5)(h) of this section, the building inspector shall, pursuant to Title 8, United States Code, Section 1373(c), verify with the federal government whether the occupant is an alien lawfully present in the United States. The building official shall submit to the federal government the identity and status information contained on the application for the residential occupancy license, along with any other information requested by the federal government.

28

(2) If the federal government reports the status of the occupant as an alien not lawfully present in the United States, the building inspector shall send the occupant, at the address of the single family residence shown on the application for residential occupancy license, a deficiency notice. The deficiency notice shall state that on or before the 60th day following the date of the notice, the occupant may obtain a correction of the federal government's records and/or provide additional information establishing that the occupant is not an alien not lawfully present in the United States. If the occupant provides such additional information, the building inspector shall promptly submit that information to the federal government. The occupant may also submit information directly to the federal government.

(3) If the federal government notifies the building inspector that it is unable to conclusively verify or ascertain the immigration status of the occupant, or that the federal government's determination of immigration status is tentative, the building inspector shall take no further action until final verification from the federal government concerning the immigration status of the occupant is received. The building inspector shall not attempt to make an independent determination of any occupant's lawful or unlawful presence in the United States. If the federal government notifies the building inspector that more information is required before the federal government can issue a final verification of the occupant's immigration status, or that the occupant may contest the federal government's determination of status, the building inspector shall notify the occupant accordingly.

(4) No earlier than the 61st day after a deficiency notice has been sent to an occupant, the building inspector shall again make an inquiry to the federal government seeking to verify or ascertain the citizenship or immigration status of the occupant. If the federal government reports that the occupant is an alien who is not lawfully present in the United States, the building inspector shall send a revocation notice to both the occupant and the lessor. The revocation notice shall revoke the occupant's residential occupancy license effective 15 days after the date of the revocation notice.

(5) If a landlord or the landlord's agent commits an offense under paragraph (C)(7) of this section, the building inspector shall suspend the landlord's rental license.

(6) During the period of suspension, the landlord shall not collect any rent, payment, fee, or any other form of compensation from, or on behalf of, any occupant or tenant in the single family residence.

(7) The suspension shall terminate one day after the landlord or the landlord's agent submits to the building inspector a sworn affidavit of the owner or agent stating that each and every violation of paragraph (C)(7) of this section on which revocation was based has ended. The affidavit shall include a description of the specific measures and actions taken to end the violation.

(8) The suspension of a landlord's rental license may be appealed to the city council pursuant to Section 26-78.

(9) The terms of this section shall be applied uniformly, and enforcement procedures shall not differ based on a person's race, ethnicity, religion, or national origin.

(E) Judicial Review

(1) Any landlord or occupant who has a received a deficiency notice or a revocation notice may seek judicial review of the notice by filing suit against the building inspector in a court of competent jurisdiction in Dallas County, Texas.

(2) In the event that such a suit is filed prior to or within 15 days after the date of the revocation notice, if any, revocation is automatically stayed until final conclusion of judicial review.

(3) The landlord or occupant may seek judicial review of the question of whether the building inspector complied with the provisions of this ordinance or other relevant provisions of federal, state, or local law, or the question of whether the occupant is lawfully present in the United States, or of both such questions.

(4) In a suit for judicial review in which the question of whether the occupant is lawfully present in the United States is to be decided, that question shall be determined under federal law . In answering the question, the court shall be bound by any conclusive determination of immigration status by the federal government. A determination is conclusive if, under federal law, it would be given preclusive effect on the question.

(5) The court shall take judicial notice of any verification of the citizenship or immigration status of the occupant previously provided by the federal government. The court may, and at the request of a party shall, request the federal government to provide, in automated, documentary, or testimonial form, a new verification of the citizenship or immigration status of the occupant pursuant to Title 8, United States Code, Section 1373(c). The most recent determination of the immigration status of an individual by the federal government shall create a rebuttable presumption as to the individual's immigration status.

(F) <u>Construction</u>

The requirements and obligations of this section shall be implemented in a manner fully consistent with federal law regulating immigration and protecting the civil rights of all citizens, nationals, and aliens."

<u>Section 2:</u>    Chapter 26, Businesses, Article III, Single-Family Rental Housing, of the Code of Ordinances, City of Farmers Branch, Texas, is hereby amended by adding the following as paragraph (f) of Section 26-78, Appeals to the City:

"(f) This section does not apply to any decision or order of the building inspector issuing a deficiency notice or a revocation notice with respect to a residential occupancy license pursuant to Sections 26- 79(D)(2) or 26-79(D)(4). Any such decision or order may be appealed only through a suit for judicial review pursuant to Section 26-79(E)."

<u>Section 3:</u>    Chapter 26, Businesses, Article IV, Apartment Complex Rental, of the Code of Ordinances, City of Farmers Branch, Texas, is hereby amended by adding the following as Section 26-119:

"Section 26-119. Citizenship or Immigration Status Verification

(A) <u>Definitions</u>

The following terms and phrases, when used in this section, shall have the meanings ascribed to them in this section, and shall be construed so as to be consistent with state and federal law, including federal immigration law:

(1) "Alien" means any person not a citizen or national of the United States, as set forth in Title 8, United States Code, Section 1101(3), as amended.

(2) "Apartment" means a dwelling unit within an apartment complex.

(3) "Landlord" means the owner of an apartment.

(4) "Lessor" means a person who leases or rents an apartment as or on behalf of a landlord.

(5) "Occupant" means a person, age 18 or older, who resides at an apartment. A temporary guest of an occupant is not an occupant for the purposes of this section.

(B) Residential Occupancy Licenses

(I) Prior to occupying any leased or rented apartment, each occupant must obtain a residential occupancy license.

(2) It is the occupant's responsibility to submit an occupancy license application to the building inspector, pay a fee of $5 to the City, and obtain a residential occupancy license. If there are multiple occupants seeking to occupy a single apartment, each occupant must obtain his or her own residential occupancy license. Multiple applicants for occupancy of the same apartment may designate one of their number as their agent to submit the required application forms, provided that each individual applicant signs his or her own application form. The building inspector may establish a procedure whereby an applicant (or designated agent) may submit the application form(s), signed by the applicant(s), via facsimile or website portal.

(3) The lessor shall notify each prospective tenant of the requirements of paragraph (B)(2) of this section.

(4) A residential occupancy license is valid only for as long as the occupant continues to occupy an apartment within the same apartment complex as the apartment for which the license was issued. Any relocation to a leased or rented single-family residence or to an apartment within a different apartment complex requires a new residential occupancy license.

(5) An application a residential occupancy license shall be made on a form furnished by the building inspector for such purpose. The form shall require the following information:

32

(a) full legal name of the occupant;

(b) mailing address of the occupant;

(c) address of the apartment for which the occupant is applying, if different from the mailing address;

(d) name and business address of the lessor;

(e) date of lease or rental commencement;

(f) date of birth of the occupant;

(g) the occupant's country of citizenship;

(h) if the applicant is a United States citizen or national, a signed declaration that the applicant is a United States citizen or national; the form shall state that it is a crime under Title 18, United States Code, Section 1015(e), for a person to knowingly make any false statement or claim that he or she is, or at any time has been, a citizen or national of the United States, with the intent to obtain on behalf of himself or herself, or any other person, any Federal or State benefit or service;

–or–

(i) if the applicant is not a United States citizen or national, an identification number assigned by the federal government that the occupant believes establishes his or her lawful presence in the United States (examples include, but are not limited to: resident alien card number, visa number, "A" number, 1-94 registration number, employment authorization number, or any other number on a document issued by the U.S. Government). If the applicant does not know of any such number, he or she shall so declare. Such a declaration shall be sufficient to satisfy this requirement.

(6) Upon receipt of the completed application and the payment of the application fee as set forth above, the building inspector shall immediately issue a residential occupancy license. The building inspector shall not deny a residential occupancy license to any occupant who submits a completed application and pays the application fee.

(7) The information provided on an application may be disclosed to the federal government according to paragraph (D) of this section, pursuant to Title 8, United States Code, Section 1373.

(C) <u>Offenses</u>

(1) It shall be an offense for a person to be an occupant of a leased or rented apartment without first obtaining a valid occupancy license permitting the person to occupy that apartment.

(2) It shall be an offense for a person to knowingly make a false statement of fact on an application for a residential occupancy license.

(3) It shall be an offense for a person to create, possess, sell, or distribute a counterfeit residential occupancy license.

(4) It shall be an offense for a lessor to lease or rent an apartment without obtaining a copy of the residential occupancy license of any and all known occupants.

(5) It shall be an offense for a person responsible for the management of an apartment complex to fail to maintain on the premises of the apartment complex a copy of the residential occupancy license of each known occupant of the apartment complex, or to fail to make such copy available for inspection by the Building Inspector during regular business hours.

(6) It shall be an offense for a lessor to lease an apartment without including in the terms of the lease a provision stating that occupancy of the premises by a person, age 18 or older, who does not hold a valid residential occupancy license constitutes an event of default under the lease.

(7) It shall be an offense for a landlord or any agent of a landlord with authority to initiate proceedings to terminate a lease or tenancy to knowingly permit an occupant to occupy an apartment without a valid residential occupancy license. It is a defense to a prosecution under this paragraph that the landlord or agent has commenced and diligently pursued such steps as may be required under the applicable law and lease provisions to terminate the lease or tenancy.

(D) <u>Enforcement</u>

The building inspector shall enforce the requirements of this section as follows.

(1) Promptly after issuance of a residential occupancy license to any occupant who has not declared himself or herself to be either a citizen or a national of the United States in accordance with paragraph (B)(5)(h) of this section, the building inspector shall, pursuant to Title 8, United States Code, Section 1373(c), verify with the federal government whether the occupant is an alien lawfully present in the United States. The building official shall submit to the federal government the identity and status information contained on the application for the residential occupancy license, along with any other information requested by the federal government.

(2) If the federal government reports the status of the occupant as an alien not lawfully present in the United States, the building inspector shall send the occupant, at the address of the apartment shown on the application for residential occupancy license, a deficiency notice. The deficiency notice shall state that on or before the 60th day following the date of the notice, the occupant may obtain a correction of the federal government's records and/or provide additional information establishing that the occupant is not an alien not lawfully present in the United States. If the occupant provides such additional information, the building inspector shall promptly submit that information to the federal government. The occupant may also submit information directly to the federal government.

(3) If the federal government notifies the building inspector that it is unable to conclusively verify or ascertain the immigration status of the occupant, or that the federal government's determination of immigration status is tentative, the building inspector shall take no further action until final verification from the federal government concerning the immigration status of the occupant is received. The building inspector shall not attempt to make an independent determination of any occupant's lawful or unlawful presence in the United States. If the federal government notifies the building inspector that more information is required before the federal government can issue a final verification of the occupant's immigration status, or that the occupant may contest the federal government's determination of status, the building inspector shall notify the occupant accordingly.

(4) No earlier than the 61st day after a deficiency notice has been sent to an occupant, the building inspector shall again make an inquiry to the federal government seeking to verify or ascertain the citizenship or

immigration status of the occupant. If the federal government reports that the occupant is an alien who is not lawfully present in the United States, the building inspector shall send a revocation notice to both the occupant and the lessor. The revocation notice shall revoke the occupant's residential occupancy license effective 15 days after the date of the revocation notice.

(5) If a landlord or the landlord's agent commits an offense under paragraph (C)(7) of this section, the building inspector shall suspend the landlord's apartment complex license.

(6) During the period of suspension, the landlord shall not collect any rent, payment, fee, or any other form of compensation from, or on behalf of, any occupant or tenant in the apartment complex.

(7) The suspension shall terminate one day after the landlord or the landlord's agent submits to the building inspector a sworn affidavit of the owner or agent stating that each and every violation of paragraph (C)(7) of this section on which revocation was based has ended. The affidavit shall include a description of the specific measures and actions taken to end the violation.

(8) The suspension of a landlord's rental license may be appealed to the city council pursuant to Section 26-118.

(9) The terms of this section shall be applied uniformly, and enforcement procedures shall not differ based on a person's race, ethnicity, religion, or national origin.

(E) Judicial Review

(1) Any landlord or occupant who has received a deficiency notice or a revocation notice may seek judicial review of the notice by filing suit against the building inspector in a court of competent jurisdiction in Dallas County, Texas.

(2) In the event that such a suit is filed prior to or within 15 days after the date of the revocation notice, if any, revocation is automatically stayed until final conclusion of judicial review.

(3) The landlord or occupant may seek judicial review of the question of whether the building inspector complied with the provisions of this

ordinance or other relevant provisions of federal, state, or local law, or the question of whether the occupant is lawfully present in the United States, or of both such questions. The landlord or occupant may seek judicial review of the question of whether the building inspector complied with the provisions of this ordinance or other relevant provisions of federal, state, or local law, or the question of whether the occupant is lawfully present in the United States, or of both such questions.

(4) In a suit for judicial review in which the question of whether the occupant is lawfully present in the United States is to be decided, that question shall be determined under federal law. In answering the question, the court shall be bound by any conclusive determination of immigration status by the federal government. A determination is conclusive if, under federal law, it would be given preclusive effect on the question.

(5) The court shall take judicial notice of any verification of the citizenship or immigration status of the occupant previously provided by the federal government. The court may, and at the request of a party shall, request the federal government to provide, in automated, documentary, or testimonial form, a new verification of the citizenship or immigration status of the occupant pursuant to Title 8, United States Code, Section 1373(c). The most recent determination of the immigration status of an individual by the federal government shall create a rebuttable presumption as to the individual's immigration status.

## (F) Construction

The requirements and obligations of this section shall be implemented in a manner fully consistent with federal law regulating immigration and protecting the civil rights of all citizens, nationals, and aliens."

Section 4: Chapter 26, Businesses, Article IV, Apartment Complex Rental, of the Code of Ordinances, City of Farmers Branch, Texas, is hereby amended by adding the following as paragraph (f) of Section 26-118, Appeals to the City:

"(f) This section does not apply to any decision or order of the building inspector issuing a deficiency notice or a revocation notice with respect to a residential occupancy license pursuant to Sections 26-119(D)(2) or 26-119(D)(4). Any such decision or order may be appealed only through a suit for judicial review pursuant to Section 26-119(D)(9)."

Section 5: Penalty

Upon conviction, any person committing any act or omission declared to be an offense under the provisions of this ordinance shall be fined in a sum not to exceed $500. A separate offense shall be deemed committed upon each day during or on which a violation occurs or continues.

Section 6: Severability

The terms and provisions of this ordinance are severable and are governed by Section 1-12 of the Code of Ordinances, City of Farmers Branch, Texas, as amended. If the application of this ordinance to any person, entity, or circumstance is invalid, the invalidity does not affect other applications of the ordinance that can be given effect without the invalid application, since the same would have been enacted by the City Council without regard to any such invalid application.

Section 7: Effective Date

This ordinance shall become effective on the 15th day after the date on which a final and appealable judgment is rendered by the United States District Court for the Northern District of Texas in the action styled Villas at Parkside Partners d/b/a Villas at Parkside, et al. v. City of Farmers Branch, Civil Action No. 3:06-CV-2371-L (consolidated with Civil Actions Nos. 3:06-CV-2376-L and 3:07-CV-0061-L). The city secretary is directed to, within 15 days after such a judgment is rendered, publish notice of the date on which this ordinance will take effect in the official city newspaper and on the city's website.

This ordinance applies only to leases or tenancies that commence on or after its effective date.

JENNIFER WALKER ELROD, Circuit Judge, concurring in part and dissenting in part:

This case is not about whether the City of Farmers Branch's housing Ordinance is a wise policy choice. It is not for judges to make that sort of political judgment. Nor do the plaintiffs argue on appeal that the Ordinance violates their individual rights. Instead, this appeal asks the narrow question of whether federal law preempts the Ordinance.

The majority concludes that the Ordinance is preempted as an impermissible regulation of immigration and implicitly preempted via conflict preemption. In crafting its conclusion, the majority conflates the distinct doctrines of regulation of immigration and conflict preemption. Because a straightforward application of Supreme Court and Fifth Circuit precedent yields a different result, I must respectfully concur in part and dissent in part. First, although the Ordinance no doubt concerns illegal immigrants, it is simply not a regulation of immigration as defined by the Supreme Court in DeCanas. Second, because the Ordinance explicitly defers to federal determinations of immigration status—similar to the statute the Supreme Court upheld last term in Whiting—it is not conflict preempted, with the exception of its separate judicial review provisions.

## I. Regulation of Immigration

In DeCanas v. Bica, 424 U.S. 351 (1976), Justice Brennan wrote for a unanimous Supreme Court holding that a state statute criminalizing the employment of illegal immigrants was not preempted by federal law. Before analyzing whether Congress had preempted the statute, the Court examined whether the law was "a constitutionally proscribed regulation of immigration that Congress itself would be powerless to authorize or approve." Id. at 356.

DeCanas began that constitutional inquiry with the principle that the "[p]ower to regulate immigration is unquestionably exclusively a federal power."

Id. at 354. "But the Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se preempted by this constitutional power, whether latent or exercised." Id. at 355. Thus, DeCanas made clear that what constitutes a "regulation of immigration" in the constitutional sense is not "the fact that aliens are the subject of a state statute." Id. Rather, the Court narrowly defined a regulation of immigration as "essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." Id.

Here, the majority concedes that the Ordinance does not determine the entry or exit of anyone into or out of the United States. This should be the end of the regulation of immigration inquiry. Yet the majority finds an application of the plain language of DeCanas to be too "literal and hypertechnical" and asserts two objections to the applicability of DeCanas's definition here.[1]

First, the majority claims the Ordinance is a regulation of immigration because it may force illegal immigrants to relocate from Farmers Branch. This theory is inconsistent with Supreme Court precedent. Just last term, the Supreme Court upheld a state law revoking the licenses of employers that knowingly employ illegal immigrants, which effectively forces aliens to relocate by depriving them of employment. Chamber of Commerce of U.S. v. Whiting, 131 S. Ct. 1968, 1973 (2011); see also DeCanas, 424 U.S. at 355–56 (holding a state law criminalizing the employment of illegal immigrants is not a regulation of

---

[1] The majority also cites to later sections of DeCanas that discussed congressional intent for state regulation in order to limit the DeCanas definition of "regulation of immigration" to instances where Congress has granted permission for state regulation. Besides being exactly backwards in terms of federalism, the majority's suggested limitation is without textual basis as DeCanas only discussed congressional intent when discussing whether Congress implicitly preempted the law, not when deciding if it were a regulation of immigration preempted by the Constitution. See DeCanas, 424 U.S. at 361.

immigration).[2] This circuit also has held that a Texas statute denying free public education to children because of their status as illegal immigrants was not preempted by federal law. See Doe v. Plyler, 628 F.2d 448, 451–54 (5th Cir. 1980), aff'd on other grounds sub nom. Plyler v. Doe, 457 U.S. 202 (1982).[3] Certainly, just like prohibiting employment, the exclusion from free public education could effectively force illegal immigrants to relocate. Yet neither of these examples constitute a regulation of immigration under Supreme Court or Fifth Circuit precedent. Rather than following this binding precedent, however, the majority bases its analysis on a Third Circuit opinion that has been vacated by the Supreme Court. See City of Hazleton v. Lozano, 131 S. Ct. 2958 (2011).

Second, the majority urges that the housing Ordinance is a regulation of immigration because of the underlying intent of the lawmakers to impact federal immigration law and aid in its enforcement. However, the fact that the lawmakers intended to aid the enforcement of federal immigration law does not render an ordinance a regulation of immigration. To the contrary, the Supreme Court has observed that:

> Although the State has no direct interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government, unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service. Despite the exclusive federal control of this Nation's borders, we cannot conclude that the States are without any power to deter the influx of persons entering the United

---

[2] Although this case deals with a city ordinance and not a state statute, no party argues that the city-state distinction would make any difference to our analysis.

[3] In Plyler, this court held that the Texas statute was not preempted, but that it did violate the children's equal protection rights under the Fourteenth Amendment. Plyler, 628 F.2d at 449–50. The Supreme Court subsequently affirmed this court's equal protection holding, without reaching the preemption issue. Plyler, 457 U.S. at 210 n.8, 230. Consequently, this court's preemption holding remains the law in this circuit. The majority opinion entirely ignores our court's binding precedent.

> States against federal law, and whose numbers might have a discernable impact on traditional state concerns.

Plyler, 457 U.S. at 228 n.23 (emphasis added). The majority's decision holds the exact opposite: that states have no power "to deter the influx" because any legislation with such an objective or effect would be an impermissible regulation of immigration.

Indeed, the majority broadly proclaims that "state and local laws that attempt to affect aliens will, with limited exceptions, be preempted by the national interest." This broad statement is directly contrary to Supreme Court precedent. See, e.g., DeCanas, 424 U.S. at 355 (holding that "standing alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration"). It is also contrary to the facts of both DeCanas and Whiting where the state statutes not only mentioned immigration standards but predicated the penalty entirely on immigration status. Id. at 352 n.1; Whiting, 131 S. Ct. at 1973. Tellingly, the majority's only attempt to distinguish the Supreme Court's guidance that local governments have the power "to deter" is that the facts in Plyler did not deal with "state regulations that directly affect the entry or removal of illegal aliens, which is what the Ordinance in this case does." This of course begs the question whether a city's prohibition of rental housing directly affects entry or removal in a way that a statewide prohibition of employment or free public education does not.

Nor does the majority's collection of sundry statements by the mayor and city attorney stating an intent to deter illegal immigration transform the Ordinance into a regulation of immigration. In fact, the legislative history to the statute in Whiting stated it was designed "to stop illegal immigration" and that state political branches acted "because it is now abundantly clear that Congress finds itself incapable of coping with the comprehensive immigration reforms our

country needs."[4] Ariz. Rev. Stat. § 23-212, Historical and Statutory Notes, Governor's Transmittal Message (signing statement of Governor Janet Napolitano). Yet the presence of that legislative history did not affect the statute's constitutionality.

For the above reasons, I disagree with the majority's holding that the housing Ordinance is a "regulation of immigration." The Ordinance concerns illegal immigrants, but to no greater extent than other laws that the Supreme Court has upheld. "Thus, absent congressional action, [the Ordinance] would not be an invalid state incursion on federal power." DeCanas, 424 U.S. at 356.

## II. Implied Preemption

Even though the housing Ordinance is not a regulation of immigration preempted independently by the Constitution, congressional action may nevertheless render the Ordinance invalid under the Supremacy Clause. Id. The majority's opinion is unclear but appears to rest its implied preemption holding on conflict preemption, stating that the Ordinance stands as an obstacle to federal law. However, last term the Supreme Court emphasized that "[i]mplied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that preempts state law." Whiting, 131 S. Ct. at 1985 (controlling opinion of Roberts, C.J.).[5]

---

[4] Although I generally eschew use of legislative history to determine a statute's intent, I discuss it here because of the majority's reliance upon it.

[5] The implied preemption analysis received only four votes as Justice Thomas joined the rest of the opinion and concurred in the judgment. Whiting, 131 S. Ct. at 1973. Justice Thomas has previously expressed disagreement with implied preemption jurisprudence more generally. See, e.g., Wyeth v. Levine, 555 U.S. 555, 583 (2009) (Thomas, J., concurring) ("I cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines. In particular, I have become increasingly skeptical of this Court's 'purposes and objectives' pre-emption jurisprudence. Under this approach the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized

The majority first errs in not applying the presumption against preemption. In reaching its conclusion that the Ordinance is not entitled to the presumption because it regulates immigration, the majority asks and answers the wrong question: "because the prerogative of deciding which aliens may live in the United States belongs to the federal government, the Farmers Branch's Ordinance does not regulate in an area historically occupied by the states, and the district court correctly declined to afford it a presumption of validity."[6] Here, the Ordinance undisputably regulates rental housing—after all, it is the denial of a rental housing license that is the basis of the complaint. Therefore, the correct question is whether the power to regulate rental housing falls within a local government's historic powers. DeCanas illustrates that this is the correct inquiry. Even though the statute in DeCanas criminalized the employment of illegal immigrants, the Court analyzed the statute as a regulation of employment, not a regulation of immigration, and determined it would not presume that Congress "intended to oust state authority to regulate the employment relationship covered by [the INA] in a manner consistent with pertinent federal laws." DeCanas, 424 U.S. at 357. Because the majority does not contest that state and local governments have a long history of regulating rental housing, "[f]ederal regulation . . . should not be deemed preemptive of

---

notions of congressional purposes that are not embodied within the text of federal law. . . . [I]mplied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution.").

[6] The majority cites to United States v. Locke, 529 U.S. 89, 108 (2000) for the proposition that "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." However, the Supreme Court has more recently held that "in all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Wyeth v. Levine, 555 U.S. 555, 565 (2009) (internal quotation marks omitted) (emphasis added). Any possible tension between Locke and Wyeth need not be reconciled here because it is not essential to this preemption question.

44

state regulatory power in the absence of persuasive reasons either that the nature of the regulated subject matter permits no other conclusion, or the Congress has unmistakably so ordained." Id. at 356 (quoting Fl. Lime & Avocado Growers v. Paul, 373 U.S. 132, 142 (1963)). The majority is simply incorrect that this strong presumption does not apply in this case.

In suggesting a conflict, the majority glosses over the Ordinance's requirement that city officials must give absolute deference to the determinations of the federal government.

> If the federal government notifies the building inspector that it is unable to conclusively verify or ascertain the immigration status of the occupant, or that the federal government's determination of immigration status is tentative, the building inspector shall take no further action until final verification from the federal government concerning the immigration status of the occupant is received. The building inspector shall not attempt to make any independent determination of any occupant's lawful or unlawful presence in the United States.

Farmers Branch, Tex., Ordinance 2952, § 1(D)(3). Here, Farmers Branch is powerless to make "any independent determination" of immigration status, which the Supreme Court called going "the extra mile" to avoid preemption. Whiting, 131 S. Ct. at 1981 (controlling opinion of Roberts, C.J.). In fact, the Ordinance mirrors the statutory language approved in Whiting. There, the Court emphasized that "the Arizona law expressly provides that state investigators . . . 'shall not attempt to independently make a final determination on whether an alien is authorized to work in the United States.'" Id. The Court concluded that "[a]s a result, there can by definition be no conflict between state and federal law." Id.[7] Moreover, not only does the Ordinance prohibit Farmers

[7] Rather than stand as an obstacle, Farmers Branch argues that its ordinance effectuates Congress's objectives and paves the way for enforcement of Congress's anti-harboring statute. 8 U.S.C. § 1324(a)(1)(A)(iii); United States v. Shum, 496 F.3d 390, 391–92 (5th Cir. 2007) (defining the four elements of a harboring violation as (1) an unlawfully present alien; (2) that the defendant conceals, harbors, or shelters; (3) while knowing or recklessly

Branch from making any decision of immigration status, but the city officials must take no action if the federal government gives an inconclusive or even a tentative determination. See Whiting, 131 S. Ct. at 1982 ("[I]f the information provided under § 1373(c) does not confirm that an employee is an unauthorized alien, it means that the county attorney cannot satisfy his burden of proof in an enforcement action.").

Nevertheless, I agree that the judicial review portion of the housing Ordinance goes beyond what was approved in Whiting because it allows a state court to review whether the occupant is lawfully present, while giving the federal determination "a rebuttable presumption as to the individual's immigration status" and making conclusive only those federal determinations that "would be given preclusive effect on the question."[8] § 1(E)(4), (E)(5). Authorizing state courts to revisit federal determinations of immigration status opens the door for conflicting state-federal rulings on an immigrant's lawful status. This creates an obstacle to Congress setting out "the sole and exclusive procedure" for determining whether an alien may be admitted or removed from

---

disregarding that the alien is unlawfully present; and (4) in a way that substantially facilitates the alien remaining in the United States). Local agencies may assist the enforcement of federal immigration law, Lynch v. Cannatella, 810 F.2d 1363, 1371 (5th Cir. 1987), and this circuit construes the anti-harboring provisions broadly. See United States v. Rubio-Gonzalez, 674 F.2d 1067, 1073 n.5 (5th Cir. 1982) ("Congress intended to broadly proscribe any knowing or willful conduct fairly within any of these terms that tends to substantially facilitate an alien's remaining in the United States illegally . . . ."). The Ordinance makes it easier to prove the anti-harboring element of a defendant's knowledge of the alien's unlawful status, removing potential doubt when a landlord leases an apartment.

[8] It is true that the Arizona law in Whiting also gave the federal determination in state court proceedings only a rebuttable presumption of lawful status. Whiting, 131 S. Ct. at 1981 n.7. It did so, however, "[a]fter specifying that a state court may consider 'only' the federal determination," thereby making it impossible "to establish unlawful status apart from the federal determination." Id. The Ordinance here does not similarly confine the state judicial inquiry, stating only that the court must use federal law and be bound by conclusive federal determinations having preclusive effect.

the United States.  8 U.S.C. § 1229a(a)(3).  Therefore, those portions of the Ordinance are conflict preempted by federal law.[9]

### III.  Conclusion

Although I share the majority's concern for the dignity of all persons, regardless of how they arrived in this great nation, the parties have only presented us the narrow legal question of whether federal law preempts Farmers Branch's Ordinance.  See Alberti v. Klevenhagen, 790 F.2d 1220, 1231 (5th Cir. 1986) (Brown, J., dissenting) ("We, and the lower federal courts, are courts of limited jurisdiction.  Our task is not to correct all social ills, however egregious they may seem to us as individuals.  The keys to the Kingdom are not in our hands.").

The Supreme Court and this circuit have foreclosed the reasoning of the majority opinion.  Until the Supreme Court provides different marching orders, the Ordinance is neither a regulation of immigration preempted by the Constitution nor (with the exception of the judicial review provisions) impliedly preempted by Congress.  Accordingly, I respectfully concur that § 1(E) and § 2(E) are conflict preempted, and dissent in all other respects.

---

[9] See § 6 ("If the application of this ordinance . . . is invalid, the invalidity does not affect other applications of the ordinance that can be given effect without the invalid application . . . .").