# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

### 12-1013

**STATE OF LOUISIANA**

**VERSUS**

**ALEXIS SARRABEA**

**\*\*\*\*\*\*\*\*\*\***
**APPEAL FROM THE**
**FIFTEENTH JUDICIAL DISTRICT COURT**
**PARISH OF LAFAYETTE, DOCKET NO.136743**
**HONORABLE KRISTIAN EARLES, DISTRICT JUDGE**
**\*\*\*\*\*\*\*\*\*\***

**SYLVIA R. COOKS**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Judges Sylvia R. Cooks, John D. Saunders and Jimmie C. Peters.

**REVERSED. DEFENDANT'S CONVICTION AND SENTENCE ARE REVERSED AND SET ASIDE.**

Chad Ikerd
15th Judicial District Public Defenders' Office
P.O. Box 3622
Lafayette, LA 70502
(337) 232-9345
**ATTORNEY FOR DEFENDANT/APPELLANT**
Alexis Sarrabea

Colin Clark
Assistant Attorney General
Louisiana Attorney General's Office
P.O. Box 94005
Baton Rouge, LA 70804-9095
(225) 326-6200
Mark Garber
Assistant District Attorney
15th Judicial District Attorney's Office
P.O. Box 3306
Lafayette, LA 70502

(337) 262-8657
**ATTORNEYS FOR APPELLEE**
State of Louisiana

**Cooks, Judge.**

## FACTS AND PROCEDURAL HISTORY

Alexis Sarrabea (Defendant), was charged by bill of information with driving without documentation demonstrating his lawful presence in the United States, a violation of La.R.S. 14:100.13, which provides:

> A. No alien student or nonresident alien shall operate a motor vehicle in the state without documentation demonstrating that the person is lawfully present in the United States.
>
> B. Upon arrest of a person for operating a vehicle without lawful presence in the United States, law enforcement officials shall seize the driver's license and immediately surrender such license to the office of motor vehicles for cancellation and shall immediately notify the INS of the name and location of the person.
>
> C. Whoever commits the crime of driving without lawful presence in the United States shall be fined not more than one thousand dollars, imprisoned for not more than one year, with or without hard labor, or both.

Defendant, a thirty year-old man, is a Spanish speaking person who does not speak or read English. The record does not contain any other facts concerning Defendant such as his country of origin. [1] The facts of record only indicate the State of Louisiana alleges it could prove Defendant is either "an alien student or an (*sic*) non-resident alien," who operated a motor vehicle in Lafayette Parish, Louisiana, "without documentation demonstrating that he was lawfully present in the United States." The record does not provide any factual basis for the police approaching Defendant, nor any basis which would establish probable cause for arresting Defendant. Additionally, the record does not provide any information on Defendant's immigration status other than to indicate Defendant was involved in the federal immigration process at the time of his arrest and at the time he entered his plea.

---

[1] Defense counsel recites in his brief Defendant is from Honduras and had his wife and two children in the car when the arrest occurred.

Defendant first entered a plea of not guilty, but, after spending more than three months in the parish jail, Defendant changed his plea to a no-contest plea. The State agreed in exchange for Defendant's no-contest guilty plea, it would recommend he receive a sentence of three months with credit for time served. Defense counsel stated on the record Defendant was entering his plea reserving his right to appeal several issues of law concerning the constitutionality of the state statute, and/or the constitutionality of applying the statute under which he was prosecuted, expressly stating "[I]t's in his best interest at this point to accept the plea so that he can move on in the Federal immigration process."

Defendant specifically asserted at the guilty plea hearing that La.R.S. 14:100.13 is preempted by federal law; it violates the Equal Protection Clause of the United States Constitution; it is over–broad and vague; and it potentially violates the provisions of the Eighth Amendment to the U.S. Constitution. Defendant was sentenced to three months in the parish jail, with credit for time served, concurrent with any other sentence he was serving at the time.

On appeal, Defendant asserts the following assignment of error and separates the assignment into four separate issues:

> The trial court erred in entering a judgment convicting the Appellant for Operating a Vehicle without Documentation of Lawful Presence because the State of Louisiana does not have the authority to require drivers to prove, with documentation, that they are lawfully in the United States. State trial courts lack subject matter jurisdiction to adjudicate this statute.
>
> Issues Presented for Review
>
> I. Did Officer Matt Broussard have any lawful authority for arresting and booking Alexis Sarrabea into the Lafayette Parish jail on probable cause that he was an undocumented immigrant driving in Lafayette Parish?
>
> II. In light of the recent United States Supreme Court case, *Arizona v. United States*, No. 11-182, 2012 WL 2368661 (U.S. June 25, 2012), is Louisiana's law requiring motor vehicle operators to carry proof that they are lawfully present unconstitutionally preempted by federal law,

which denies Louisiana trial courts subject matter jurisdiction to convict persons under the law?

III. Does Louisiana's law unconstitutionally regulate immigration by creating a pervasive law which practically excludes all undocumented aliens from Louisiana by making it improperly difficult for them to move around the state for work or basic necessities?

IV. Does Louisiana's law create a scheme for regulating immigration and aliens which is impermissible under the federal constitution?

## LEGAL ANALYSIS

Defendant entered a guilty plea preserving his right to seek review of specified issues[2] pursuant to *State v. Crosby*, 338 So.2d 584 (La.1976). In *Crosby*, the court held in pertinent part:

> [E]ven an unqualified plea of guilty does not preclude review of what are regarded as 'jurisdictional' defects—those which, even conceding the accused's factual guilt, do not permit his conviction of the offense charged. These include, for example: the lack of jurisdiction of the sentencing court, La.C.Cr.P. art. 362(1); the conviction represents double jeopardy, La.C.Cr.P. art. 362(2), *State ex rel. Wikberg v. Henderson*, 292 So.2d 505 (La.1974); *Menna v. New York*, 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975); the prosecution, when instituted, had prescribed, La.C.Cr.P. art. 362(7), see also *State ex rel. Williams v. Henderson*, 289 So.2d 74 (La.1974); the state lacked constitutional or legal power to try the accused for the offense charged, *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); *State ex rel. Jackson v. Henderson*, 283 So.2d 210 (La.1973); **the statute under which the prosecution is brought is unconstitutional**, *State v. Bergeron*, 152 La. 38, 92 So. 726 (1922); the charge brought by the indictment does not constitute a crime, *State v. Watson*, 41 La.Ann. 598, 7 So. 125 (1889); certain types of patent error preventing conviction for the offense, La.C.Cr.P. art. 920(2), see indicative listing at *State v. Guillot*, 200 La. 935, 9 So.2d 235, 239 (1942).

*Id.* at 586-589 (emphasis added).

We note in the record Defendant did not file a motion to quash the bill of information on the basis that the statute was unconstitutional, thus the trial court made no ruling on this issue. Generally, *Crosby* pleas allow a defendant to

---

[2] The record recites the plea was entered as an *Alford* plea, but it is clear that Defendant entered his plea pursuant to *Crosby* expressly reserving his right on the record to raise several constitutional law issues on appeal.

preserve his right to seek review of a trial court's pretrial rulings. Although in this case there was no pretrial ruling on this issue, Defendant expressly preserved his right to raise several issues regarding the constitutionality of this statute on appeal, and it is therefore properly before this court on appeal. In *State v. Flores*, 27,736, p. 3 (La.App. 2 Cir. 2/28/96), 669 So.2d 646, 649, the court explained in pertinent part:

> Attacks on the constitutionality of a statute may be made by two methods. The statute itself can be challenged, or the state's application to a particular defendant can be the basis of the attack. Constitutional challenges may be based upon vagueness. *State v. Gamberella*, [633 So.2d 595 (La.App. 1st Cir. 1993), *writ denied*, 94-0200 (La. 6/24/94), 640 So.2d 1341] *supra*; *State v. Walker*, 26,026 (La.App. 2d Cir. 5/4/94), 637 So.2d 583, *writ denied,* 94-1369 (La. 9/30/94), 642 So.2d 868.

In this case, Defendant challenges the statute itself. Additionally, in *Flores*, 669 So.2d at 649, the court explained in pertinent part:

> [T]he Louisiana Supreme Court has consistently held that the facial unconstitutionally of a statute on which a conviction is based is an error discoverable by the mere inspection of the pleadings and proceedings, without inspection of the evidence. This issue is subject to appellate review under La.C.Cr.P. Art. 920, even though the defendant did not raise the issue in the trial court and did not comply with the assignment of error procedure in La.C.Cr.P. Art. 844 or with the contemporaneous objection rule of La.C.Cr.P. Art. 841. *State v. Hoofkin*, 596 So.2d 536 (La.1992); *State v. Stewart*, 325 So.2d 828 (La.1976), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2213, 48 L.Ed.2d 822 (1976). Also, the defendant is entitled to raise this issue, even though he entered a plea of guilty. *State v. Crosby*, 338 So.2d 584 (La.1976).
>
> Statutes are presumed to be valid; whenever possible, the constitutionality of a statute should be upheld. *State v. Gamberella*, 633 So.2d 595 (La.App. 1st Cir.1993), *writ denied,* 94-0200 (La. 6/24/94), 640 So.2d 1341. Because a state statute is presumed constitutional, the party challenging the statute bears the burden of proving its unconstitutionality.

Initially, we note Defendant asserts on appeal the officer lacked probable cause to arrest him. However, Defendant did not file a motion to suppress on this ground in the trial court, and did not preserve his challenge of this issue when he

4

entered his guilty plea. Defendant therefore waived the issue of probable cause for his arrest as a basis to attack his conviction, and we are precluded from reviewing this issue on appeal. Next, Defendant contends the trial court erred in entering a judgment convicting him for operating a vehicle without documentation of lawful presence because the State of Louisiana does not have the authority to require drivers to prove, with documentation acceptable to state authorities, they are lawfully present in the United States. Further, he contends the courts of this State lack subject matter jurisdiction over the status of aliens.

Defendant argues La.R.S. 14:100.13 is an unconstitutional attempt to preempt federal law because it attempts to preempt the field of alien registration which is occupied by federal law. Thus, he asserts, the trial court lacked jurisdiction to convict him. In support of this assertion Defendant cites *Arizona v. United States*, 576 U.S. ___, 132 S.Ct. 2492 (2012). We find the decision in *Arizona* dispositive in this case and binding upon this court.

Defendant directs our attention to Section 3 of the Arizona law at issue in that case which he argues is similar in scope to La.R.S. 14:100.13. He contends La.R.S. 14:100.13, like the Arizona Statute, invades federal law by penalizing the failure to carry documents proving a person's lawful presence in the United States. Defendant further asserts the field of alien registration occupied by the federal government includes establishing requirements and penalties for failure to carry proof of lawful status. He maintains La.R.S. 14:100.13 is conflict preempted because the Louisiana penalty further intrudes into federal law by making the state penalty harsher than the federal penalty for failure to carry documentation. Under the federal law, such a failure is a misdemeanor, whereas under Louisiana law it is a felony. Defendant asserts La.R.S. 14:100.13 "institutes state criminal charges

5

against certain aliens that federal officers may determine should not be prosecuted. . . ." Defendant further points out, when the Louisiana First Circuit Court of Appeals addressed this issue, it relied on the argument that the state law was complementary to the federal law. This reasoning, as Defendant correctly notes, was recently rejected by the U.S. Supreme Court in *Arizona*. All of the cases considered by our sister circuit preceded the decision in *Arizona* and are therefore of no precedential value here.

Defendant also contends La.R.S. 14:100.13 has the "practical effect" of excluding undocumented aliens as drivers of motor vehicles on the public highways of this state. In support of his argument, he cites *Villas at Parkside v. City of Farmers Branch, Tex.,* 675 F.3d 802 (5ᵗʰ Cir. 2012), (herein after referred to as *Farmers Branch*) and states in pertinent part:

> In *Farmers Branch*, the federal Fifth Circuit held that an ordinance passed by a city in Texas was constitutionally, field, and conflict preempted. 675 F.3d 802. The City of Farmer Branch, Texas passed an ordinance requiring, among other things, "that every adult person wishing to rent or lease any single family residence or apartment within Farmers Branch must apply for a residential occupancy license from the City's Building Inspector." *Id*. at 804. The ordinance further required that all applicants who were not United States citizens or nationals must provide identification numbers establishing that they were lawfully present. *Id*. After the applicant received a license, which was to be issued immediately, the Building Inspector only then was to verify the non-citizen's legal status with the federal government; no independent determination by the Building Inspector was allowed. *Id*. Criminal sanctions were created for violators who either occupied rental housing without a license or provided false documentation. *Id*.

> The Fifth Circuit "conclude[d] that the ordinance's sole purpose [was] *not* to regulate housing but to exclude undocumented aliens, . . . and that it [was] an impermissible regulation of immigration." *Id*. (emphasis in original). The court further concluded that the "Ordinance is designed to burden aliens, both documented and undocumented. . . . As such, the Ordinance serves no legitimate City interest and is not a mere housing regulation entitled to a presumption

against preemption; instead it burdens the field of immigration." *Id*. at 807.

Defendant asserts the Louisiana statute creates "a comprehensive classification, determination, and notification scheme which impermissibly regulates immigration," stating in pertinent part:

> Louisiana's Immigration law is a regulatory scheme that (1) creates "classifications" of aliens that are not found under federal law, (2) calls for state agents to make "determinations" as to whether a person fits within one of the state classifications, in addition to granting state agencies, alone, the authority to "determine" which documents actually "demonstrate lawful presence," and (3) calls for the state agents to ultimately "notify" federal immigration officials only *after* an arrest has been made. R.S. §§ 14:100.11-100.14. While the notification requirement alone may not be unconstitutional, when combined with the classification and determination elements of Louisiana's law, both of which are unconstitutional, the "state scheme" is preempted as a regulation of immigration.

Defendant also complains La.R.S. 14:100.13 impermissibly grants authority to Louisiana and its agencies to determine which documents provide satisfactory proof of an alien's legal presence in the United States. As he points out, the state officers are directed to look at the state law to determine what documents satisfy the statute instead of federal law.[3]

Defendant concedes the notification requirement of the statute does not facially preempt federal law because federal law envisions coordination between the State and federal authorities for reporting known or suspected immigration violators. However, Defendant suggests the notification requirement of the statute further emphasizes the comprehensiveness of Louisiana's scheme.

Responding, the State argues La.R.S. 14:100.13 is not field preempted because it is not an alien registration statute, unlike Section 3 of the Arizona law.

---

[3]The list of documents are referenced in La.R.S. 32:409.1 and set forth in La. Admin. Code title 55 section 147(B)(1).

7

The State asserts there is no federal crime with the same elements as La.R.S. 14:100.13 and further argues in pertinent part:

> Sanabea (sic) attempts to conflate the field of alien registration with the field of regulating the legal operation of motor vehicles. The First Circuit found that the field at issue is the regulation of public roads, rather than that of alien registration.

Moreover, the State argues conflict preemption does not exist because both laws can be complied with, and La.R.S. 14:100.13 does not create an obstacle for enforcement of federal law. The State further contends:

> It appears that a person who violates La. R.S. 14:100.13 must also be violating 8 U.S.C. § 1304(e) at the same time. This is of no consequence in terms of conflict preemption. *See e.g. Hughes v. State*, 943 So.2d 176, 186 (Fla. 3rd Dist. App. 2006). Field preemption, on the other hand, would prevent Louisiana from passing La. R.S. 14:100.13 even if it complemented federal law.

The State additionally asserts only the federal government decides what immigration consequences, if any, attach to a conviction under La.R.S. 14:100.13. It also contends the *Farmers Branch* case is of questionable precedential value as there is currently an *en banc* rehearing pending which was granted on July 31, 2012. *Villas at Parkside v. City of Farmers Branch, Tex.,* 675 F.3d 802 (5th Cir. 2012). It distinguishes the law at issue in *Farmer's Branch* from La.R.S. 14:100.13 by asserting the legislative intent behind La.R.S. 14:100.13, which was set forth in La.R.S. 14:100.11, is to combat terrorism. The State insists La.R.S. 14:100.13, unlike the law in question in *Farmer's Branch*, does not have the practical effect of preventing illegal immigrants from residing, living, or working in Louisiana. It disagrees with Defendant's position that La.R.S. 14:100.13 is a classification scheme and argues it does not determine who is and is not lawfully in the United States.

We believe Defendant's focus on the Supreme Court's ruling in *Arizona* regarding section 3 of the Arizona law is well-placed. We could find no reported

8

Louisiana cases addressing the constitutionality of La.R.S. 14:100.13 since the ruling in *Arizona*. Previously, when Louisiana's law was challenged on the grounds of preemption, the First Circuit Court of Appeal addressed this issue in several cases.[4] In its earliest decision the first circuit correctly found La.R.S. 14:100.13 is preempted by federal law. In its later decisions, the first circuit reversed its position holding that the legislative intent set forth in enacting the statute and the nature of the statute is a legitimate police power of the state. Be that as it may, the U.S. Supreme Court in *Arizona* held such power cannot be exercised by a state when so fully preempted by the United States.

We are satisfied that the decision in *Arizona* is controlling in this case. In *Arizona,* the U.S. Supreme Court clearly held where Congress occupies an entire field, as it has in the field of alien registration, even a *complementary* state regulation is impermissible. *Arizona*, 132 S.Ct. at 2503. We find La.R.S. 14:100.13 is an impermissible attempt by Louisiana to regulate matters in a field already preempted by federal law.

As the U.S. Supreme Court so aptly states in *Arizona*:

> The history of the United States is in part made of the stories, talents, and lasting contributions of those who crossed oceans and deserts to come here.

> The National Government has significant power to regulate immigration. With power comes responsibility, and the sound exercise of national power over immigration depends on the Nation's meeting its responsibility to base its laws on a political will informed by searching, thoughtful, rational, civic discourse. Arizona may have understandable frustrations with the problems caused by illegal immigration while that process continues, but the State may not pursue policies that undermine federal law.

---

[4] *See State v. Gonzalez-Perez*, 07-1813 (La.App. 1 Cir. 2/27/08), 997 So.2d 1, *writ denied*, 09-292 (La. 12/18/09), 23 So.2d 930 and *State v. Sanchez*, 10-16 (La.App. 1 Cir. 6/11/10), 39 So.3d 834. However, in *State v. Lopez*, 05-685 (La.App. 4 Cir. 12/20/06), 948 So.2d 1121, *writ denied*, 07-110 (La. 12/7/07), 969 So.2d 619, the court previously found that La.R.S. 14:100.13 was preempted by federal law.

*Arizona,* 132 S.Ct. at 2510.

Nor can Louisiana pursue policies that undermine federal law despite its legislature's apparent belief that Louisiana is also frustrated with problems caused by terrorism occasioned by illegal immigrants. Louisiana has enacted laws and applied administrative provisions in tandem with La.R.S. 14:100.13 which seek to make its own determination of what forms of documentation are acceptable proof of an alien's right to be in the United States or Louisiana, disregarding federal provisions in the field of immigration which fully regulate forms of documentation foreign visitors are required to obtain and carry. In *Arizona*, as discussed below, we were informed that such documentation often relates to an alien's given status at a particular time or at a particular juncture of the naturalization process, or, according to the alien's relationship to the United States at a given time:

> The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens. (citations omitted) This authority rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization," U.S. Const. Art. I, §8, cl.4, and its inherent power as sovereign to control and conduct relations with foreign nations[.] (citations omitted)

> The federal power to determine immigration policy is well settled. Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws. (citations omitted) Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad. (citation omitted)

> It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States. See *Chy Lung v. Freeman*, 92 U.S. 275, 279-280, 23 L.Ed. 550 (1876); see also The Federalist No. 3, p. 39 (C. Rossiter ed. 2003) (J. Jay) (observing that federal power would be necessary in part because "bordering States … under the impulse of sudden irritation, and a quick sense of apparent interest or injury" might take action that would undermine foreign relations.) This court has reaffirmed that "[o]ne of the most important and delicate of all international relationships … has to do with the

10

protection of the just rights of a country's own nationals when those nationals are in another country."

*Id*. at 2498 (citations omitted).

The U.S. Supreme Court also found in *Arizona* the federal government has extensively dealt with the complex rules, regulations, and requirements relating to immigration and alien status. It explained:

> Unlawful entry and unlawful reentry into the country are federal offenses. §§1325, 1326. Once here, aliens are requested to register with the Federal Government and to carry proof of status on their person. See §§ 1301-1306. *Failure to do so is a federal misdemeanor.* §§ 1304(e), 1306(a). Federal law also authorizes States to deny noncitizens a range of benefits, §1622; and it imposes sanctions on employers who hire unauthorized workers, §1324a.

> Congress has specified which aliens may be removed from the United States and the procedures for doing so. Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law. See § 1227. *Removal is a civil, not criminal, matter.* A principal feature of the removal system is the broad discretion exercised by immigration officials. See Brief for Former Commissioners of the United States Immigration and Naturalization Service as *Amici Curiae* 8-13 (hereinafter Brief for Former INS Commissioners). Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all. If removal proceedings commence, aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal. See § 1229a(c)(4); see also, e.g., §§1158 (asylum), 1229b (cancellation of removal), 1229c (voluntary departure).

> Discretion in the enforcement of immigration law embraces immediate concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this Nation's international relations. Returning an alien to his own country may be deemed inappropriate even where he has committed a removable offense or fails to meet the criteria for admission. The foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return. The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities.

*Id*. at 2499 (emphasis added).

Louisiana's statute makes actions by an alien present in this country a felony offense while the same action by such an alien visitor is but a misdemeanor offense under federal law which provides that "removal is a civil, not criminal, matter," *Id*. at 2499, with broad discretion to exercise removal being "[a] principal feature of the removal system." *Id*. at 2499. We note Section 3 of the Arizona statute, rejected by the United States Supreme Court, only made the offense a misdemeanor, but, because it imposed stricter penalties than the federal laws, it was held unconstitutional by the Supreme Court under the Supremacy Clause. Louisiana Revised Statute 14:100.13, which makes failure to carry proof of lawful presence in the United States while driving in Louisiana a felony offense, impermissibly usurps federal authority.

> Section 3 of S.B. 1070 creates a new state misdemeanor. It forbids the "willful failure to complete or carry an alien registration document … in violation of 8 United States Code section 1304(e) or 1306(a)." Ariz.Rev.Stat. Ann. § 11-1509(A) (West Supp.2011). In effect, § 3 adds a state-law penalty for conduct proscribed by federal law. The United States contends that this state enforcement mechanism intrudes on the field of alien registration, a field in which Congress has left no room for States to regulate."

*Arizona*, 132 S.Ct. at 2501.

The United States Supreme Court made it very clear in *Arizona* that the states may not in any manner, even by enacting "complimentary" laws, intrude in an area of law entirely occupied by federal law. It said:

> The framework enacted by Congress leads to the conclusion here, as it did in *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399 (1941), that the Federal Government has occupied the field of alien registration. *See American Ins. Assn. v. Garamendi*, 539 U.S. 396, 419, n. 11. 123 S.Ct. 2374, 156 L.Ed. 2d 376 (2003) (characterizing *Hines* as a field preemption case); *Pennsylvania v. Nelson*, 350 U.S. 497, 504, 76 S.Ct. 477, 100 L.Ed. 640 (1956) (same)[.] (citation omitted) The federal statutory directives provide a full set of standards governing alien registration, including the punishment for noncompliance. It was

designed as a "'harmonious whole'" *Hines, supra.* at 72, 61 S,Ct, 399. *Where Congress occupies an entire field, as it has in the field of alien registration, even complimentary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards. See Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984).

Federal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders. If § 3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations, "diminish[ing] the [Federal Government]'s control over enforcement" and "detracting from the "integrated scheme of regulation' created by Congress." *Wisconsin Dept. of Industry v. Gould Inc.,* 475 U.S. 282, 288-289, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986). *Even if a State may make violation of federal law a crime in some instances, it cannot do so in a field (like the field of alien registration) that has been occupied by federal law.* See *California v. Zook,* 336 U.S. 725, 730-731, 733, 69 S.Ct. 841, 93 L.Ed. 1005 (1949); see also *In re Loney,* 134 U.S. 372, 375-376, 10 S.Ct. 584, 33 L.Ed. 949 (1890) (States many not impose their own punishment for perjury in federal courts).

Arizona contends that § 3 can survive preemption because the provision has the same aim as federal law and adopts its substantive standards. This argument not only ignores the basic premise of field preemption – *that States may not enter, in any respect, an area the Federal Government has reserved for itself* – but also is unpersuasive on its own terms. Permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted. Cf. *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 347-348, 121 S.Ct. 1012, 148L.Ed.2d 854 (2001) (States may not impose their own punishment for fraud on the Food and Drug Administration); *Wisconsin Dept., supra,* at 288, 106 S.Ct. 1057 (States may not impose their punishment for repeat violations of the National Labor Relations Act). Were § 3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies.

There is further intrusion upon the federal scheme. Even where federal authorities believe prosecution is appropriate, there is an inconsistency between § 3 and federal law with respect to penalties. Under federal law, the failure to carry registration papers is a misdemeanor that may be punished by a fine, imprisonment, or a term of probation. See 8 U.S.C. § 1304(e) (2006 ed.); 18 U.S.C. § 3561. State law, by contrast, rules out probation as a possible sentence (and also eliminates the possibility of a pardon). See Ariz.Rev.Stat. Ann. § 13-1509(D) (West Supp. 2011). This state framework of sanctions creates a conflict with the plan Congress put in place. See *Wisconsin*

> *Dept.*, supra, at 286, 106 S.Ct. 1057 ("[C]onflict is imminent whenever two separate remedies are brought to bear on the same activity" (internal quotation marks omitted)).
>
> These specific conflicts between state and federal law simply underscore the reason for field preemption. As it did in *Hines*, the Court now concludes that, with respect to the subject of alien registration, *Congress intended to preclude States from "complement[ing] the federal law, or enforce[ing] additional or auxiliary regulations."* 312 U.S., at 66-67, 61 S.Ct. 399. Section 3 is preempted by federal law.

*Id*. at 2502-03. (emphasis added)(citations omitted).

We find La.R.S. 14:100.13 is likewise preempted by federal law.

The United States Supreme court in *Arizona* also considered Section 6 of S.B. 1070, Ariz.Rev.Stat. Ann. § 13-3883(A)(5)(West Supp.2011), which authorizes Arizona law enforcement authorities "without a warrant, [to] arrest a person if the officer has probable cause to believe . . . [the person] has committed any public offense that makes [him] removable from the United States." *Id.* at 2504. Louisiana Revised Statute 14:100.13 impliedly also authorizes law enforcement personnel to make a warrantless arrest of any "alien student or nonresident alien" La.R.S. 14:100.13(A), if such persons are found "operating a vehicle [on Louisiana roadways] without lawful presence in the United States." *See* La.R.S. 14:100.13(B). Moreover, the Louisiana Statute imposes a requirement on "alien student[s] or nonresident alien[s]" requiring they carry with them "documentation demonstrating that the person is lawfully present in the United States." *Id.* Louisiana Revised Statute 14:100.13 does not expressly require any probable cause for arrest, and when questioned in oral argument, the State's attorney could not, or would not, offer any response to this court's repeated encouragement that he offer one example of what might constitute probable cause for an arrest under La.R.S. 14:100.13. Moreover, La.R.S. 14:100.13 offers no

14

definition of the terms "alien student" or "nonresident alien." These terms have no real meaning under the federal immigration scheme and are not recognized in federal immigration provisions. Neither does the statute define what is meant by "lawfully present in the United States." La.R.S. 14:100.13(A). Indeed it is for the federal government to define "lawful presence" in the United States and it has done so through a complex and comprehensive scheme regulating immigration and naturalization. These unanswered questions in Louisiana's statute underscore the reason why the various states in the United States cannot be left to their own designs to "compliment" federal law or make additional or auxiliary requirements to federal immigration law. The United States Supreme Court in *Arizona* expressly recognized the unwelcome prospect of state laws such as La.R.S. 14:100.13 being used to unnecessarily harass college students from foreign countries attending our great universities. Indeed it is foretelling that Louisiana's statute expressly targets "alien student[s]." *Id*. Rejecting Arizona's Section 6 of S.B. 1070, the United States Supreme Court explained in further detail its reasons for holding such state laws unconstitutional.

> *As a general rule, it is not a crime for a removable alien to remain present in the United States.* See *INS v. Lopez-Mendoza*, 448 U.S. 1032, 1038, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984). If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent. When an alien is suspected of being removable, a federal official issues an administrative document called a Notice to Appear. See 8 U.S.C. § 1229(a); 8 CFR § 239.1(a) (2012). The form does not authorize an arrest. Instead, it gives the alien information about the proceedings, including the time and date of the removal hearing. See 8 U.S.C. § 1229(a)(1). If an alien fails to appear, an *in absentia* order may direct removal. § 1229a(5)(A).
>
> The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process. For example, the Attorney General can exercise discretion to issue a warrant for an alien's arrest and detention "pending a decision on whether the alien is to be removed from the United States." (citations omitted) And if an alien is ordered removed after a hearing, the Attorney General will issue a warrant. See 8 CFR § 241.2(a)(1). In both instances, the warrants are

15

executed by federal officers who have received training in the enforcement of immigration law. See §§ 241.2(b), 287.5(e)(3). If no federal warrant has been issued, those officers have more limited authority. See 8 U.S.C. § 1357(a). They may arrest an alien for being "in the United States in violation of any [immigration] law or regulation," for example, but only where the alien "is likely to escape before a warrant can be obtained." § 1357(a)(2).

Section 6 attempts to provide state officers even greater authority to arrest aliens on the basis of possible removability than Congress has given to trained federal immigration officers. Under state law, officers who believe an alien is removable by reason of some "public offense" would have the power to conduct an arrest on that basis regardless of whether a federal warrant has issued or the alien is likely to escape. This state authority could be exercised without any input from the Federal Government about whether an arrest is warranted in a particular case. This would allow the State to achieve its own immigration policy. *The result could be unnecessary harassment of some aliens* (*for instance*, a veteran, *college student*, or someone assisting with a criminal investigation) whom federal officials determine should not be removed.

*This is not the system Congress created*. Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer. A principal example is when the Attorney General has granted that authority to specific officers in a formal agreement with a state or local government. See § 1357(g)(1)[.] . . . .

By authorizing state officers to decide whether an alien should be detained for being removable, § 6 violates the principle that the removal process is entrusted to the discretion of the Federal Government. (citations omitted) A decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and must be made with one voice. (citations omitted)

In defense of § 6, Arizona notes a federal statute permitting state officers to "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B). There may be some ambiguity as to what constitutes cooperation under the federal law; but no coherent understanding of the term would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government. . . . [T]he unilateral state action to detain authorized by § 6 goes far beyond these measures, defeating any need for real cooperation.

Congress has put in place a system in which state officers may not make warrantless arrests of aliens based on possible removability except in specific, limited circumstances. By nonetheless authorizing

state and local officers to engage in these enforcement activities as a general matter, § 6 creates an obstacle to the full purposes and objectives of Congress.  See *Hines,* 312 U.S. at 67, 61 S.Ct. 399. Section 6 is preempted by federal law.

*Arizona*, 132 S.Ct. at 2505-07 (citations omitted) (emphasis added).

To put it plain and simple, La.R.S. 14:100.13 is preempted by federal law; and the State of Louisiana lacks Constitutional authority to enforce it.  Defendant's conviction and sentence are reversed and set aside.  All costs of this appeal are assessed against the State of Louisiana.

**REVERSED.  DEFENDANT'S CONVICTION AND SENTENCE ARE REVERSED AND SET ASIDE.**

17