BRIGHT, Circuit Judge,
dissenting.
The city of Fremont, Nebraska enacted a housing ordinance with the purpose of removing “illegal aliens,” or undocumented persons,[13] from the city. Fremont seeks to usurp power reserved to the federal government by identifying undocumented persons and forcing them out of the city, and perhaps the country. The federal government has the exclusive authority to determine which immigrants may reside in this country and which immigrants will be removed. Fremont may not exercise this power, even within its own boundaries. Neither Fremont nor any other city in this nation may enact a system of regulation designed to remove presently undocumented immigrants. Sections 2, 3, and 4 of Ordinance 5156 (“the Ordinance”) are conflict preempted because they stand as an obstacle to a federal objective. I strongly dissent.
In June 2010, the voters of Fremont adopted the Ordinance by public initiative. The heart of the Ordinance is the prohibition of harboring. The Ordinance declares that it is unlawful for any person or business entity to harbor an undocumented person. The Ordinance further explains that knowingly renting a dwelling to an undocumented person constitutes harboring. Any undocumented person who rents a' dwelling in Fremont is deemed to have breached a condition of their lease.[14] As the sponsors of the Ordinance noted, the Ordinance is designed to prevent undocumented persons from renting, and thus living, in Fremont.
Sections 3 and 4 of the Ordinance create an occupancy license system to enforce the harboring prohibition. Every prospective renter in Fremont must obtain an occupancy license before the renter may occupy a rented dwelling. This involves submitting an application for the license, and $5, to the Fremont Police Department. The application will request basic information, such as name, date of birth, the address of the dwelling, and “country or citizenship.” Additionally, applicants will be required to either (1) declare that they are a United States citizen or national; (2) provide an identification number establishing their lawful presence; or (3) declare they do not know of any such identification number establishing their lawful presence. This is an effective means to identify and deter undocumented persons from living in Fremont. Few, if any, undocumented persons will fill out and sign an application which requires them to disclose their undocumented status.
An undocumented person who declares his or her unlawful presence would receive an occupancy license immediately upon completing the application and could then begin occupancy of the rented dwelling. However, the process will not end here. After issuing an occupancy license to an undocumented person, the Fremont Police *954 Department will submit the person’s information to the federal government “to ascertain whether the occupant is an alien lawfully present in the United States.” This reporting of unlawful presence to the federal government is an additional deterrent to undocumented persons obtaining housing in Fremont.
When the federal government reports to Fremont that an undocumented person is indeed unlawfully present,[15] the Police Department will issue the person a deficiency notice, wait 60 days to allow the person to correct the federal government’s information and prove their lawful presence, and check again after 60 days have elapsed. If the federal government again responds that the undocumented person is unlawfully present, the Police Department will then issue a revocation notice. This notice provides for revocation of the person’s occupancy license after 45 days. Under this process, an undocumented person’s occupancy will rest on uncertainty for a lengthy period.
Even if an undocumented person would hazard applying for an occupancy license, under the Ordinance this person’s license will inevitably be revoked. And in the process, that person will be reported to federal authorities. This is how the Ordinance will keep undocumented persons out of Fremont — either they will be deterred from attempting to rent dwellings or they will have their occupancy licenses revoked and be forced to leave. The Ordinance prevents undocumented persons from renting in Fremont, which is tantamount to preventing them from living in the city at all.[16]
The district court concluded that several parts of the Ordinance are conflict preempted. Keller v. City of Fremont, 853 F.Supp.2d 959, 972-73 (D.Neb.2012). In reaching this conclusion, the court noted two important facts. First, Congress created the INA, a complex scheme for adjudicating immigrants’ right to remain in the country. Id. at 972. The INA and other federal regulations provide the structure for the classification and removal of undocumented persons. Id. at 973. Second, persons who enter the United States illegally and remain here unlawfully are nonetheless often allowed to stay in the United States pending adjudication of their status and they may eventually be granted a legal status. Id. at 972.
The district court concluded that sections 2, 3(L), and 4(D) are conflict preempted because they present an obstacle to the accomplishment of a federal objective. Id. at 972-73. The district court isolated these sections because they “prohibit[ ] the harboring of illegal aliens, and provid[e] for the revocation of occupancy licenses and for certain penalties following such revocation.” Id. at 973. The court reasoned that these penalty provisions remove undocumented persons from Fremont, and “[i]f states or political subdivisions take independent action to remove aliens from their jurisdiction, essentially forcing them from one state or community to another where their identity and whereabouts may be obscured, the structure Congress has established for the classification, adjudication, and potential removal of aliens will be impaired.” Id. at 973.
*955 We must consider whether the Ordinance “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). “What is a sufficient obstacle is a matter of judgment.” Crosbf v. Nat’l Foreign Trade Council, 530 U.S. 363, 373, 120 S.Ct. 2288; 147 L.Ed.2d 352 (2000). The majority concludes that the Ordinance does not directly remove undocumented persons from Fremont, and thus the Ordinance does not conflict with the federal removal power. I disagree with the majority on this matter of judgment. I would affirm the district court’s application of conflict preemption. However, this district court did not go far enough. I would determine that all of sections 2, 3, and 4 are preempted because they are an obstacle to the comprehensive federal system of removal and the uniform enforcement of immigration law. The conclusion that the housing provisions of the Ordinance are conflict preempted is supported ' by three of our sister circuits— every circuit yet to speak on this issue. United States v. Alabama, 691 F.3d 1269 (11th Cir.2012), cert. denied, — U.S.-, 133 S.Ct. 2022, 185 L.Ed.2d 905 (2013); Villas at Parkside Partners v. City of Farmers Branch, 675 F.3d 802 (5th Cir.), vacated 2013 WL 3791664 (5th Cir.2013 en banc); Lozano v. City of Hazleton, 620 F.3d 170 (3d Cir.2010), vacated and remanded for further consideration, — U.S.-, 131 S.Ct. 2958, 180 L.Ed.2d 243 (2011), aff. in part, rev. in part 2013 WL 3855549 (7/26/2013) en banc.
The Third Circuit addressed an identical harboring prohibition in Lozano, 620 F.3d at 179.' Hazleton, Pennsylvania enacted an ordinance making it “ ‘unlawful for any person or . business entity that owns a dwelling unit in the City to harbor an illegal alien in the dwelling unit, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law.’ ” Id. This is word-for-word the same language used in Fremont’s harboring provision. Hazleton’s harboring prohibition was also enforced through a system of occupancy permits, and the Hazleton ordinance required prospective renters to prove their citizenship or lawful residency to obtain a permit. Id. at 180. The Loza/no plaintiffs sued to enjoin the Hazleton ordinance pre-enforcement, as a facial challenge. Id. at 181.
The Third Circuit concluded that “[tjhrough its housing provisions, Hazleton attempts to regulate residence based solely on immigration status.” Id. at 220. The court also determined that the Hazle-ton ordinance was “in essence” about removal of undocumented persons from the city, because “ ‘[i]t is difficult to conceive of a more effective method’ of ensuring that persons do not enter or remain in a locality than by precluding their ability to live in it.” Id. at 220-21 (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 160, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989)). “[I]t appears plain that the purpose of these housing provisions is to ensure that aliens lacking legal immigration status reside somewhere other than Hazle-ton.” Id. at 224.
The Third Circuit held that the housing provisions were conflict preempted[17] be *956 cause they attempted to remove undocumented persons from the city “based on a snapshot of their current immigration status, rather than based on a federal order of removal.” Id. at 221. This produces conflict with federal law because unlawful presence or undocumented status is not in every case equivalent with removability or with eventual removal. “Under federal law, an unlawful immigration status does not lead instantly, or inevitably, to removal.” Id. Additionally, undocumented persons are afforded numerous procedural protections under federal law before an order of removal may issue. See id. at 197. The federal government will sometimes exercise its discretion not to prosecute a removal, “thereby tacitly allow[ing] the presence of those whose technical status remains ‘illegal.’ ” Id. at 222. Even once a removal proceeding is commenced, it is far from certain it will result in removal.[18] Id. Therefore, removing an undocumented person from a city based on a current unlawful status, exhibits “either a lack of understanding or a refusal to recognize the complexities of federal immigration law.” Id. The Hazleton ordinance would have removed undocumented persons from the city without affording them any procedural protections and even if the federal government would permit those persons to remain. Based in part[19] on this conflict with federal law, the court upheld a permanent injunction against enforcement of the Hazleton housing provisions. Id. at 224.
Next, the Fifth Circuit addressed a housing ordinance nearly identical to Fremont’s in Farmers Branch.[20] 675 F.3d at 804. The Farmers Branch ordinance similarly would have required prospective renters in the city to apply for an occupancy license. Id. Just as in Fremont, undocumented applicants for this license would have been required to declare that they lack knowledge of any identification number establishing their lawful presence. Id. Just as in Fremont, such a declaration would prompt the city to verify the applicant’s immigration status with the federal government and would eventually lead to a revocation of the license for all undocumented persons. Id. The Farmers Branch ordinance was also challenged on its face, pre-enforcement. Id. at 806.
The Fifth Circuit panel opinion concluded that “[t]he removal of illegal immigrants is thus the precise and intended effect of the Ordinance.” Id. at 810. Based on this effect of removal, the court held that the ordinance was conflict preempted.[21] Id. at 817. The court reasoned that Farmers Branch sought to remove undocumented persons by compelling their departure from the city, thereby setting its own immigration policy. Id. at *957 813. The Farmers Branch ordinance thus “threatens the careful balance that the federal government must maintain in foreign affairs and impedes the federal prerogative for deciding how to treat illegal immigrants.” Id. at 815. The Fifth Circuit affirmed the permanent injunction against the ordinance, in part because it stood as “an obstacle to federal authority over immigration and the conduct of foreign affairs.” Id. at 817.
Most recently, the Eleventh Circuit addressed a similar ordinance in United States v. Alabama.[22] 691 F.3d 1269. Although many provisions of the Alabama law were challenged, two are relevant here. First, section 13 created a state crime for harboring an undocumented person, which included renting a dwelling to an undocumented person. Id. at 1277. Second, section 27 prohibited, with limited exceptions, the enforcement of any contract entered by an undocumented person. Id. at 1278. Both sections, challenged on their face pre-enforcement, were deemed preempted. Id. at 1287, 1296. The court first determined that section 13 was both field and conflict preempted. Id. at 1287-88. The court explained that “section 13 undermines the intent of Congress to confer discretion on the Executive Branch in matters concerning immigration.” Id. at 1287. Furthermore, the court found that the rental prohibition in section 13 “effectuates an untenable expansion of the federal harboring provision.” Id. at 1288. Ultimately, the court determined that section 13 was conflict preempted because it mandated enforcement of additional regulations not contemplated by the INA. Id.
The Eleventh Circuit also found section 27 preempted. Id. at 1296. Notably, the court stated that section 27 would remove undocumented persons from Alabama, thus exercising an exclusively federal power. Id. at 1293. The court was “convinced that Alabama has crafted a calculated policy of expulsion, seeking to make the lives of unlawfully present aliens so difficult as to force them to retreat from the state.” Id. at 1294. This, the court concluded, Alabama cannot do. “[T]he expulsion power Alabama seeks to exercise through section 27 conflicts with Congress’s comprehensive statutory framework governing alien removal.” Id. Removal of undocumented persons by the state of Alabama conflicts with federal law because it gives no “regard for any of the statutory processes or avenues for granting an alien permission to remain lawfully within the country.” Id. at 1295. Furthermore, a state law which removes undocumented persons from that state conflicts with a federal objective because “Congress intends the Executive Branch to retain discretion over expulsion decisions and applications for relief.” Id. Ultimately, the court held that section 27 was preempted because only the federal government may determine who must be removed and who may remain. Id. A state or locality may not “unilaterally determine that any alien unlawfully present in the United States cannot live within the state’s territory.” Id.
Arizona v. United States, — U.S.-, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) also supports this dissent. Arizona reaffirmed basic principles of immigration law. “The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens.” Id. at 2498. Only the federal government may determine the immigration policy of our nation and states may not enact legislation designed to achieve their own immigration policy. Id. at 2498, 2506. One important aspect of immigration law and policy entrusted to the federal government alone is the power to control the removal of persons from the United States: “[Tjhe *958 removal process is entrusted to the discretion of the Federal Government.” Id. at 2506. Arizona also emphasized the need for a uniform, national voice on immigration policy, particularly on issues of removal. Decisions about removability “touch on foreign relations and must be made with one voice.” Id. at 2506-07.
Based on these principles, the Supreme Court struck down three of the four challenged provisions of the Arizona law. Two of the provisions, sections 5(C) and 6, were struck down based on conflict preemption. Section 5(C) made it a state misdemeanor crime for “unauthorized aliens” to apply for work in Arizona. Id. at 2503. The Court concluded that although section 5(C) pursued a common goal with federal law— the deterrence of unlawful employment— there was a conflict in the method of enforcement. Id. at 2505. The Court determined that Congress had chosen not to impose criminal penalties on undocumented persons who engage in unauthorized employment — there was no federal counterpart to section 5(C). Id. at 2503-OS. This section was conflict preempted because Arizona chose a contrary enforcement mechanism, creating “an obstacle to the regulatory system Congress chose.” Id. at 2505.
The Supreme Court also found section 6 conflict preempted. Id. at 2507. Section 6 provided for warrantless arrests where an officer had probable cause to believe the arrestee was removable. Id. at 2505. The Court found this section in conflict with federal law because it gave state law enforcement officers greater authority to arrest than Congress gave federal immigration officers. Id. at 2506. “This state authority could be exercised without any input from the Federal Government about whether an arrest is warranted in a particular case.” Id. Permitting such a marked difference from federal law would have allowed Arizona to achieve its own immigration policy. Id. Although section 6 did not directly remove any undocumented person from the state, the mere fact that it touched on the federal removal process created a conflict. Giving state officers the power to decide whether a person could be detained for being removable “violates the principle that the removal process is entrusted to the discretion of the Federal Government.” Id.
These two provisions of the Arizona law were facially conflict preempted, before the law was ever enforced. Although the Court recognized that “a basic uncertainty about what [a] law means and how it will be enforced” may caution against finding conflict preemption at the pre-enforcement stage, id. at 2510, the Court also implicitly recognized that where the effect of a law and the conflict with federal law is certain, pre-enforcement conflict preemption is entirely appropriate. This was the case with sections 5(C) and 6 of the Arizona law. A court may perhaps refrain from finding conflict preemption where it would need to assume that a law will be construed in a way that creates a conflict. But this sort of assumption is not necessary in all cases of pre-enforcement conflict analysis. By striking down two sections of the Arizona law on conflict grounds, the Supreme Court confirmed that a certainty in conflict permits a court to find conflict preemption at the pre-enforcement stage.
There is no uncertainty about the effect of the Ordinance and no need to make assumptions or speculate about how it will be implemented. Just as in Arizona, the effect of the Ordinance, and thus the grounds for conflict, are entirely clear pre-enforcement. The purpose and effect of the Fremont ordinance is exclusion and removal of undocumented persons.[23] Like *959 the contracting provision in Alabama, the Fremont ordinance seeks to make life so difficult for undocumented persons that they must retreat. The Ordinance leaves undocumented persons with no realistic way to attain housing. “The undeniable practical effect of the Ordinance is thus to compel the departure of aliens from the City to other cities, states, or foreign countries.” Farmers Branch, 675 F.3d at 813.
The federal government exercises complete and exclusive control over the removal of undocumented persons. Fremont may not usurp this power by removing undocumented persons from its boundaries. “To be meaningful, the federal government’s exclusive control over residence in this country must extend to any political subdivision.” Lozano, 620 F.3d at 221. Arizona emphasized the importance of removal decisions and the national imperative that they be made with one voice. 132 S.Ct. at 2506-07. Although section 6 of the Arizona law did not directly remove any undocumented persons from the state — it allowed state officers to detain an undocumented person for being removable — the Supreme Court found it preempted because it was related to removal. Id. The Fremont ordinance has a much closer relationship to removal than did section 6. So it, too, “violates the principle that the removal process is entrusted to the discretion of the Federal Government.” Id. at 2506. If the more remote connection between section 6 and removal is enough to trigger conflict preemption, the same must be true of the Ordinance.
The Ordinance creates an obstacle to the accomplishment of a federal objective because it interferes with the comprehensive federal system of adjudication and removal of undocumented persons. Like section 5(C) in Arizona, the Ordinance is “an obstacle to the regulatory system Congress chose.” 132 S.Ct. at 2505. “[I]t is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens.” Mathews v. Diaz, 426 U.S. 67, 84, 96 S.Ct.-1883, 48 L.Ed.2d 478 (1976). Any action by a state or locality to remove undocumented persons interferes with the exclusive power of the federal government over removal. Fremont may not “unilaterally determine that any alien unlawfully present in the United States cannot live within the [city’s] territory.” Alabama, 691 F.3d at 1295.
Illegal immigration and the residence of undocumented persons in the United States is a national issue. “[T]he treatment of aliens entails issues of national concern that reach beyond parochial concerns of individual states.” Farmers Branch, 675 F.3d at 814. States and cities “may have understandable frustrations with the problems caused by illegal immigration,” but they “may not pursue policies that undermine federal law.” Arizona, 132 S.Ct. at 2510. “Legal imposition of distinct, unusual, and extraordinary burdens and obligations on aliens ... bears an inseparable relationship to the welfare and tranquility of all the states, and not merely to the welfare and tranquility of one.” Hines, 312 U.S. at 65-66, 61 S.Ct. 399.
The Ordinance will impose a distinct burden on undocumented persons by preventing them from renting housing in Fremont. This denial of rental housing is paramount to removal from the city. And, as the Supreme Court has made clear, removal is entrusted exclusively to the federal government. Therefore, the Ordinance poses an obstacle to the accomplish *960 ment of a federal objective, and it should be enjoined based on conflict preemption.

. Although the Ordinance uses the term "illegal alien” to describe persons unlawfully present in the United States, in this dissent I refer to such persons by the term "undocumented person.”

. The Ordinance will apply only prospectively and will not affect undocumented persons with existing leases, until they try to move to a new unit or dwelling.

. The Police Department may not take action if the federal government's ascertainment of the person’s status is inconclusive or tentative and must instead wait for a "final ascertainment.” The Police Department may not attempt to independently verify an undocumented person's status.

. Moreover, the Ordinance creates problems for all landlords and potential tenants by complicating the process of obtaining rental housing. If the Ordinance goes into effect, landlords may try to limit their risk of liability for harboring by finding reasons not to rent to any person they suspect to be undocumented.

. The Supreme Court vacated and remanded Lozano for further consideration in light of its opinion in Chamber of Commerce v. Whiting, - U.S. -, 131 S.Ct. 1968, 179 L.Ed.2d 1031 (2011). City of Hazleton v. Lozano, — U.S. -, 131 S.Ct. 2958, 180 L.Ed.2d 243 (2011). aff. in part, rev. in part 2013 WL 3855549 (en banc) (3d Cir.2013). Whiting concerned an Arizona law regulating the employment of undocumented persons, but did not involve the issue of harboring or housing regulations. The Supreme Court gave no direction on remand regarding Lozano 's hold *956 ings on harboring. Therefore, these holdings may survive the Third Circuit's reconsideration.

.At the conclusion of a removal hearing, the immigration judge may decide that the undocumented person is not removable. Lozano, 620 F.3d at 197 (citing 8 U.S.C. § 1229a(c)(l)(A)). Even if the immigration judge determines the undocumented person is removable, the judge may grant relief in the form of postponement of removal, cancellation of removal, or even adjustment of status to that of a lawful permanent resident. Id. (citing 8 U.S.C. §§ 1229a(c)(4), 1229b).

. The court also concluded that the housing provisions are unconstitutional regulations of immigration and are field preempted by the INA. Id. at 220-21.

. The Fifth Circuit granted rehearing en banc in Farmers Branch. Villas at Parlcside Partners v. City of Farmers Branch, 688 F.3d 801 (5th Cir.2012). Vacated 2013 WL 3791664 (en banc) (2013). I discuss the case here because the reasoning of Judge Reavley’s opinion for the panel is logical and persuasive.

. The court also held that the ordinance preempted as a regulation of immigration. Farmers Branch, 675 F.3d at 811.

. The Supreme Court recently denied a writ of certiorari in Alabama, 133 S.Ct. 2022.

. The majority disputes that the Ordinance effects any direct removal of undocumented persons. But this is undoubtedly the purpose *959 of the Ordinance and will be its result. " 'It is difficult to conceive of a more effective method’ of ensuring that persons do not enter or remain' in a locality than by precluding their ability to live in it.” Lozano, 620 F.3d at 220-21.